IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JASON MEYER, an individual;
ARGIL DX LLC f/k/a ZAP
TECHNOLOGY SOLUTIONS LLC, a
Nevada limited liability company; and
ARGIL DX, putative partnership,

          Plaintiffs,

    v.

ANKUR MITTAL, an individual; AXENO
CONSULTING PVT. LTD. f/k/a
ARGILDX CONSULTING PVT. LTD.
f/k/a ACCUNITY SOFTWARE PVT.
LTD., an Indian private company; and
ADX CONSULTING INC., a Texas
corporation,

          Defendants.

No. 3:21-cv-00621-HZ

OPINION & ORDER

Adam D. Rose
Eric C. Lang
Rose Law Firm, P.C.
5200 Meadows Rd, Ste 150
Lake Oswego, OR 97035

David S. Aman
Aman Law LLC

14705 SW Millikan Way
Beaverton, OR 97003

      Attorneys for Plaintiffs

Sara Cotton
Nika Aldrich
Mario Delegato
Schwabe, Williamson & Wyatt, P.C.
1211 SW 5th Ave, Ste 1900
Portland, OR 97204

      Attorneys for Defendants

HERNÁNDEZ, District Judge:

Plaintiffs bring trademark infringement claims and a variety of tort and contract claims against Defendants arising out of the parties' former business relationship. Am. Compl., ECF 29. Defendants assert a variety of counterclaims and affirmative defenses in response. Am. Answer, ECF 99. Plaintiffs and Defendants move for summary judgment on different claims and issues. ECF 183, 186, 187, 188. For the following reasons, the Court denies Plaintiffs' Motion and grants Defendants' Motion in part and denies it in part.

## BACKGROUND

The Court laid out many of the facts of this case in its Opinion and Order denying Defendants' First Motion for Summary Judgment. ECF 164. The Court will not recount those facts in full here, but will address additional or disputed facts as appropriate.

I.    **The Parties' Collaboration**

Plaintiff Jason Meyer is the sole member of Plaintiff Argil DX LLC, formerly known as Zap Technology Solutions LLC, a web-design company.[1] ECF 164 at 2. Plaintiffs Meyer and

---

[1] Due to the similarity of names between Plaintiff entities, the Court will refer to Plaintiff Argil DX LLC as "Zap" and Plaintiff Argil DX, putative partnership, as "the partnership."

Zap are based in Oregon. *Id.* Defendant Ankur Mittal co-founded Defendant Axeno Consulting under the name "Accunity." *Id.* Defendant Axeno is based in India. *Id.* Defendant Axeno was previously known as ArgilDX Consulting. Defendant Axeno and four of its executives, including Defendant Mittal, formed ADX Consulting, a Texas corporation, in September 2020. *Id.* The plaintiff partnership is an entity whose existence the parties dispute.

The parties agree that Plaintiffs Meyer and Zap and Defendants Mittal and Axeno engaged in joint branding and marketing under the name "Argil DX" beginning in 2017. *Id.* at 3-4. Plaintiffs allege that those parties formed a partnership, while Defendants deny that any partnership was formed, asserting that Defendant Axeno was a subcontractor for Plaintiff Zap. *Id.* Plaintiff Zap and Defendant Axeno also shared an email domain and Microsoft 365 server, though they dispute the details and significance of the arrangement. *Id.* at 5-8.

## II.    The Ernst & Young Contracts

In 2017, Brighthouse Financial ("Brighthouse" or "BHF") hired Ernst & Young LLP ("EY") to develop and design its website. Aldred Decl. Ex. 2 at 1, ECF 189. In January 2018, EY contracted with Plaintiff Zap to perform the work. *Id.* Plaintiff Meyer, Defendant Mittal, and Pankaj Bansal, an executive of Defendant Axeno, were listed as key personnel. *Id.* at 16. The contract was later extended to December 31, 2019. Aldred Decl. Ex. 3. The amendment stated, "Subcontractor's name has changed from 'Zap Technology Solutions, LLC' to 'Argil DX LLC.'" *Id.* at 1. Plaintiff Zap (under the name Argil DX, LLC) entered into another contract with EY in April 2018. Aldred Decl. Ex. 4 at 1. Plaintiff Meyer, Defendant Mittal, and several other individuals were listed. *Id.* at 14. The contract was renewed on January 1, 2019. Aldred Decl. Ex. 5 at 1. Plaintiff Zap (under the name ArgilDX LLC) entered into another contract with EY in January 2020. Aldred Decl. Ex. 6 at 1. It was extended in January 2021. Aldred Decl. Ex. 7, ECF

190. Plaintiff Zap (under the name Argil DX LLC) entered into another contract with EY in June

2021. Aldred Decl. Ex. 8 at 1. Performance of the June 2021 contract was estimated to be

completed on or about May 23, 2022. *Id.* at 16. Plaintiff Meyer's contacts at EY included Greg

Picarelli, Anne Kimbrel, and Jim Reynolds. Aldred Decl. Exs. 27, 28 (correspondence with EY).

> The EY contract entered into in January 2018 contained the following term:

> In order for EY to fulfill its independence requirements related to business relationships with third parties, EY must periodically evaluate the materiality of each such relationship. Subcontractor represents that the aggregate amounts expected to be earned by Subcontractor from EY under all agreements with EY for the performance of services shall not exceed 40% of Subcontractor's revenues . . . for each fiscal year of Subcontractor in which Services (or such other services) will be performed.

Aldred Decl. Ex. 2 at 8 (Art. VIII, § C(2)). The section also stated:

> . . . Subcontractor shall inform EY immediately of any change in fact that could make any representations in VIII C . . . (2) . . . false in any respect. If any of Subcontractor's representations ceases to be accurate in all respects, or if Subcontractor breaches any of its obligations hereunder, EY may terminate the Subcontract without further notice or obligation to Subcontractor.

*Id.* (Art. VIII, § C(5)). Later contracts contained terms with a revenue ratio requirement of 45%

rather than 40%. Aldred Decl. Ex. 4 at 8 (April 2018 contract); Ex. 6 at 10 (January 2020

contract); Ex. 8 at 9 (June 2021 contract). In the June 2021 contract, EY reserved the right to

terminate the agreement for various reasons, including breach and "[i]f EY believes in good faith

that applicable laws, professional obligations, requirements or standards (including those related

to independence or conflicts matters) as adopted, promulgated or followed by the SEC or

PCAOB require such termination[.]" *Id.* Ex. 8 at 3-4.

> The contracts all contained a clause stating, in part, "Subcontractor may not assign,

delegate, or further subcontract any of its rights, duties, or obligations hereunder to any other

person or entity without the express prior written consent of EY." Aldred Decl. Ex. 2 at 12; Ex. 4

at 12; Ex. 6 at 17; Ex. 8 at 14. It is undisputed that employees of Defendant Axeno worked on

the EY contracts, though the nature of the working relationship is disputed. Def. Second Through

Sixth Mot. Summ. J. ("Def. Second Mot.") 4, ECF 186; Pl. Resp. 3, ECF 205.

EY required Plaintiff Zap to fill out a "Proposed Business Relationship Independence

Information Evaluation Questionnaire." Aldred Decl. Exs. 89 (emails from EY sending

questionnaires to Plaintiff Meyer); 10 (June 2021 questionnaire), 12 (December 2019

questionnaire), 13 (June 2021 questionnaire), 14 (December 2019 questionnaire), 15 (June 2020

questionnaire). The questionnaire explained that the information requested was "relevant,

required, and necessary" because:

> Ernst & Young LLP ("EY") falls under the regulatory jurisdiction of both the
> Securities and Exchange Commission ("SEC") and the Public Company
> Accounting Oversight Board ("PCAOB") which promulgate rules and regulations
> and have oversight authority over the public accounting industry.

> When EY is engaged in discussions concerning a potential business relationship,
> the third party is requested to provide certain confidential business information to
> EY necessary to comply with the rules and regulations promulgated by the SEC
> and the PCAOB prior to entering into any business relationship.

*E.g.*, Aldred Decl. Ex. 10 at 1. EY explained that information about annual revenue was required

because:

> To determine the materiality of the potential relationship, EY must evaluate the
> dollar amount of all relationships in place with an entity (estimated EY spend or
> proceeds) compared to the entity's (or its ultimate parent company's) annual
> revenue.

> EY is required to closely monitor relationships which EY considers material to that
> other party to avoid having the other party become an "associated entity", as set
> forth in independence regulations.

*Id.* at 2. The questionnaires also attached EY's standard independence representations and

termination provisions. *Id.* at 7.

Plaintiff Meyer admits that Plaintiff Zap's revenues from the EY contracts constituted 47% of Plaintiff Zap's 2018 revenue, 72% of its 2019 revenue, 64% of its 2020 revenue, and 61% of its 2021 revenue. Aldred Decl. Ex. 1, Meyer Dep. 403:18-404:19. Plaintiff Meyer also admits that he provided false revenue figures to EY in the questionnaires. Def. Second Mot. 8; Pl. Resp. 14. Those false figures covered the years 2018, 2019, and 2020. Def. Second Mot. 9; Pl. Resp. 14. For all three years, Plaintiff Zap represented a higher total revenue to EY than its true total revenue. Def. Second Mot. 9; Aldred Decl. Ex. 1, Meyer Dep. 438:9-439:1; Aldred Decl. Ex. 19 (2018 actual revenue was $2,910,539, represented revenue was $3,735,774; 2019 actual revenue was $2,064,417, represented revenue was $4,204,415; 2020 actual revenue was $1,409,550, represented revenue was $2,503,769). Finally, in filling out the EY questionnaires, Plaintiff Meyer represented that he was not affiliated with any entities other than Plaintiff Zap. Aldred Decl. Ex. 10 at 3-4 (specifying no other entity affiliations for Plaintiff Meyer); Ex. 12 at 3 (same); Ex. 13 at 3-4 (same); Ex. 14 at 3 (same); Ex. 15 at 3 (same).

On August 19, 2021, Defendant Mittal forwarded to Nilanjan Mukherjee, an executive of Defendant Axeno, a draft of the EY master service agreement contract template that Plaintiff Meyer had emailed to him in January 2018. Williams Decl. Ex. B, ECF 206. On August 27, 2021, Defendant Mittal contacted Anne Kimbrel at EY, stating that he "would really appreciate, if even redacted version of final contract that is signed for this project between EY and Argil (US) could be shared with me." Williams Decl. Ex. C at 2. He repeated his request on October 20, 2021. *Id.* Kimbrel responded the same day, stating that she would "work with Jim [Reynolds] on getting you the contracts." *Id.* On October 22, Kimbrel stated that she planned to send them. *Id.* at 3-4.

On November 25, 2021, Defendant Mittal messaged Kimbrel and Reynolds to advise of Defendant Axeno's new name, and stated, "if you want to setup a meeting with BHF and let them know of change, you can do that post Wednesday, as long as you are confident that they are not going to write an email to Jason after that discussion. Also looking forward to hear how eforms contract can be tackled at your end." *Id.* at 1. On December 7, Defendant Mittal messaged Kimbrel and stated, "Until the contract transitions from ARGIL DX to Axeno for eforms, I legally cannot acknowledge eforms discussions. So let's keep it all off the record. Any sense on how it's going to get navigated at EY since it's a headache I want to come out of sooner than later." *Id.* at 4. Kimbrel responded that "we are looking into it" and said, "I hope it is okay to chat as we're figuring things out, just to make sure BHF is good through it all." *Id.* Defendant Mittal also told Kimbrel, "Just for your info, we have unilaterally informed Jason that we are hiving off of our separate business, since he wouldn't have agreed to it. So he is going to be displeased for sure when it comes to light about you working with us. Please please please don't say I reached out to you since it will become legal issue for me. Just say you decided after you saw the news of axeno if possible." *Id.* at 5.

On December 15, 2021, EY sent a letter to Plaintiffs Meyer and Zap that it was terminating its June 30, 2021, contract with Plaintiff Zap effective 30 days after the date of the letter. Aldred Decl. Ex. 27. On December 16 and 21, Plaintiff Meyer emailed EY to discuss the termination and fulfilling obligations of termination. *Id.* Ex. 28 at 2-3. EY responded that it was "getting KT from the Dev team directly to BHF mostly in the tools." *Id.* at 2. Plaintiff Meyer responded, "you have chosen to communicate directly with the developers and not management. Without sounding too direct, neither Argil DX LLC nor I can be held accountable for either failure to provide knowledge transfer or the consequences of knowledge transfer from which I

have been excluded." *Id.* at 1. He stated, "I'm happy to provide any service or data or materials required by Article III" of the contract. *Id.*

On January 1, 2022, EY entered into a contract with Defendant Axeno for "AEM Development" for Brighthouse. Aldred Decl. Ex. 29. On January 20, 2022, EY entered into a contract with Defendant Axeno to develop e-forms for Brighthouse. Williams Decl. Ex. D; Aldred Decl. Ex. 35. EY entered into another contract with Defendant Axeno for "Brighthouse AEM Development" on January 18, 2023. Aldred Decl. Ex. 31.

## III.    Plaintiff Zap's Tax Filings and Loan Application

Defendants' Seventh Motion for Summary Judgment centers on certain representations by Plaintiffs Meyer and Zap. In submitting federal tax returns on behalf of Plaintiff Zap during the years of the purported partnership, Plaintiff Meyer attested that Zap did not "[o]wn directly an interest of 20% or more, or own, directly or indirectly, an interest of 50% or more in the profit, loss, or capital in any foreign or domestic partnership (including an entity treated as a partnership)[.]" Aldred Decl. Ex. 18 at 2 (2020 tax return amended), Ex. 38 at 3 (2018 tax return), Ex. 39 at 12 (2019 tax return), Ex. 40 at 6 (2020 tax return), Ex. 41 at 6 (2021 tax return). In submitting Plaintiff Zap's Oregon tax returns, Plaintiff Meyer included a copy of the federal tax form that made the representation and declared that his Oregon tax returns, including any enclosures, were true, correct, and complete. *Id.* Ex. 44 at 3, 8-9 (2018 return); Ex. 45 at 3, 8-9 (2019 return), Ex. 46 at 10 (2020 return), Ex. 47 at 12, 18-19 (2021 return).

Plaintiff Meyer applied for a Paycheck Protection Program ("PPP") loan from the Small Business Administration ("SBA") on behalf of Plaintiff Zap in February 2020. Aldred Supp. Decl. Ex. 48 / 54, ECF 201. In that application, Plaintiff Meyer checked "No" to the question "Is the Applicant or any owner of the Applicant an owner of any other business, or have common

management (including a management agreement) with any other business?" *Id.* at 2. Plaintiff

Meyer testified that at the time he submitted his tax returns and PPP loan application, he believed

they were accurate. Aldred Resp. Decl. Ex. 94, Meyer Dep. 297:15-18, 462:11-463:18, ECF 203.

## IV.    The End of the Parties' Collaboration

As the Court explained in its previous Opinion and Order, the parties' business

relationship grew strained, leading Defendant Mittal to email Plaintiff Meyer in January 2021

that he thought the parties should go their separate ways. ECF 164 at 8. On January 28, 2021,

Defendant ADX Consulting filed a trademark application for the mark "Argil DX." Compl. Ex.

1, ECF 1. The application included several screenshots from the website that Plaintiff Zap and

Defendant Axeno had shared. *Id.* at 2. Defendant Mittal signed the application on behalf of

Defendant ADX. *Id.* at 3. The application was abandoned on January 25, 2022, after a decision

by the Trademark Trial and Appeal Board. Aldred Decl. Ex. 91.

Shortly after Defendant Mittal's January 2021 email, Plaintiff Meyer began backing up

emails and other documents on the Microsoft 365 server the parties had been sharing. ECF 164

at 9-12. In April 2021, Plaintiffs Meyer and Zap sued Defendants. Sometime thereafter,

Defendant Mittal deleted emails from the Microsoft 365 server. *Id.* at 10.

On December 3, 2021, Defendant Mittal emailed Plaintiffs Meyer and Zap. Aldred Decl.

Ex. 21, ECF 190. Defendant Mittal stated:

> As you are aware we do not agree with your position that there is any legal
> partnership between Zap and Accunity. This letter is to advice [sic] you that to the
> extent, a court eventually agrees that there was a partnership created, we hereby
> unequivocally terminate that alleged partnership or partnership as perceived by
> you, effective immediately.
>
> We have always maintained a Client-Vendor relationship and that is evident from
> the way in which we did business under the common brand name. Going forward
> we shall continue to maintain the same Client-Vendor relationship in case we do

any new business with each other, where you sub-contract to us and we deliver the work to the end client.

*Id.* The email advised that Defendants were announcing a new brand and identity that same day and that Defendants would remove their information from the common website and social media pages. *Id.* Defendants stated that they would continue to offer services to Plaintiff Zap. *Id.* They also advised that they would continue to use invoices with the Argil DX name for an unspecified period of time. *Id.*

Defendants previously moved for summary judgment on their counterclaim for violation of the Stored Communication Act ("SCA") and for sanctions, based on Plaintiff Meyer's downloading of Defendants' emails and other documents (the "email backups"). The Court denied that motion. ECF 164. Plaintiffs now move for summary judgment on Defendants' SCA and invasion of privacy counterclaims, both of which are based on the email backups. ECF 183.

Defendants move for summary judgment on their unclean hands affirmative defense. Def. Second Mot. 2-13, ECF 186. Defendants also move for partial summary judgment on Plaintiffs' fiduciary duty claims as related to the EY contracts and events occurring after December 3, 2021. *Id.* at 13-20. Next, Defendants move for summary judgment on Plaintiffs' claims for disgorgement of profits and intentional interference with economic relations. *Id.* at 20-35. Defendants move for a ruling that Plaintiffs are estopped from arguing that there was a partnership. Def. Seventh Mot. for Partial Summ. J. ("Def. Seventh Mot."), ECF 187. Finally, Defendants move for summary judgment on Plaintiffs' trademark infringement claims. Def. Eighth Mot. for Partial Summ. J. ("Def. Eighth Mot."), ECF 188. The Court held oral argument on January 12, 2024, and took the Motions under advisement.

**STANDARDS**

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing "a genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927-28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support its claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**DISCUSSION**

The Court first addresses Plaintiffs' Motion and concludes that Plaintiffs are not entitled to summary judgment on Defendants' SCA and invasion of privacy counterclaims. Turning to Defendants' Motions, the Court concludes that Defendants are not entitled to summary judgment on their unclean hands defense and are only entitled to summary judgment on their fiduciary duty claims insofar as the claims challenge Defendants' conduct on the EY contracts under a partnership theory. Next, the Court concludes that Defendants are not entitled to summary judgment on Plaintiffs' claim for disgorgement of profits. Defendants are not entitled to summary judgment on Plaintiffs' claim for intentional interference with the then-current EY contract, but they are entitled to summary judgment on the claim as to future contracts. The Court declines to estop Plaintiffs from asserting that a partnership existed. Finally, the Court concludes that Defendants are not entitled to summary judgment on Plaintiffs' trademark infringement claims.

## I.    Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs move for summary judgment on Defendants' fourth counterclaim, for invasion of privacy, and fifth counterclaim, for violation of the SCA. Pl. Mot. 2; Am. Answer ¶¶ 344-53. The Court concludes that material disputes of fact remain, and Plaintiffs are not entitled to summary judgment on these claims.

### A.    SCA Claim

In ruling on Defendants' motion for summary judgment on their SCA claim, the Court laid out the standard of an SCA claim in detail. ECF 164 at 13-29. The Court incorporates and applies that standard here. Relevant here, the Court held that in order to prevail, "the plaintiff in an SCA claim must prove that the defendant knew that he or she was not authorized to access the

facility in question or knew that the access exceeded his or her authorization." *Id.* at 21. Plaintiffs argue that they are entitled to summary judgment on the SCA claim because the undisputed evidence shows that Plaintiff Meyer did not intend to break the law and believed that he had the right to access Defendant Mittal's emails in order to protect the partnership. Pl. Mot. 3. Plaintiff Meyer submits a declaration stating that when he downloaded the emails, he believed that the partnership existed, that he was a partner, and that he had the right to download and review the emails by virtue of his role as founder and CEO of the partnership. Meyer Mot. Decl. ¶¶ 4-5, ECF 184. He states that he downloaded the emails "to protect Argil DX – the partnership – from wrongdoing and in possible litigation." *Id.* ¶ 3. He states that he did not believe he was violating the law by doing so, and continues to believe he did not violate the law. *Id.* ¶ 6.

To support his belief in the existence of a partnership, Plaintiff Meyer points to evidence that a partnership existed. *Id.* ¶ 8. That evidence includes a common website, email domain, and social media pages; statements by Mr. Mittal regarding a partnership; an announcement of a merger; a profit-sharing system and sharing of cost and revenue information; and appearances at trade shows under the common brand. *Id.* The Court considered most of this evidence in previously holding that there was a genuine dispute as to whether a partnership existed. ECF 164 at 34-36. Plaintiff Meyer also states that he believed he had the right to access the server because Plaintiff Zap was the initial owner of the server. Meyer Decl. ¶ 8. He also states that at the same time, he was "actively accessing other accounts such as Hubspot, Jira, and BitBucket" with Defendant Mittal's permission. *Id.*

Defendants respond with evidence that undermines Plaintiff Meyer's stated belief that a partnership existed. Def. Resp. 5-6, ECF 202. They point to Plaintiff Meyer's tax returns, SBA loan application, and failure to list the partnership in the EY questionnaires. *Id.* Plaintiffs argue

that "Defendants have not raised any inference that links the alleged misstatements, on the one hand, to Mr. Meyer's state of mind when he backed up the emails, on the other." Pl. Reply 12, ECF 208. They state that none of the forms involved email. *Id.* They also argue that the forms "are either of the unchecked box or yes/no variety." *Id.* "Plaintiffs submit that the state of mind to write a declarative statement – not at issue here – is different than the state of mind to filling out a form." Finally, Plaintiffs state that the tax returns and PPP loan form were filled out by others. *Id.* at 13.

The Court concludes that Defendants have raised a genuine issue as to whether Plaintiff Meyer subjectively believed that he could access the emails in order to protect the partnership. Because Plaintiff Meyer asserted that he believed he could access the emails by virtue of his role as a partner, contemporaneous evidence suggesting that he did not believe there was a partnership is relevant. It does not matter that the tax returns, SBA application, and EY questionnaires did not concern email. The Court also rejects Plaintiffs' arguments that the forms are not probative because they were of the checkbox or yes/no variety or because someone other than Plaintiff Meyer actually prepared some of them. Plaintiffs provide no evidence that the preparers were responsible for any errors in the content of the forms and cite to no caselaw absolving Plaintiff Meyer of responsibility for these representations. Based on the evidence, a jury could conclude that Plaintiff Meyer believed that there was a partnership and that it gave him the right to access Defendants' emails, and that any omissions or misstatements on the forms were an honest oversight. Alternatively, a jury could conclude that Plaintiff Meyer did not believe there was a partnership and that he accessed Defendant Mittal's emails with the belief that he was not authorized to access them.

Plaintiff Meyer's other proffered justifications also fail to show an absence of a material dispute. As for his assertion that he believed he could access Defendant Mittal's emails because he was accessing other social media platforms, the email backups were made at a time when Defendant Mittal had identified dissatisfaction with the parties' working relationship and suggested that they part ways. A jury could reasonably conclude that given the tension in the working relationship, Plaintiff Meyer did not actually believe that Defendant Mittal's prior permission to access other social media accounts extended to access of his email. And while Plaintiff Meyer now asserts that he believed he could access the emails because Plaintiff Zap was the initial owner of the server, he presented a different perspective in opposing Defendants' motion for summary judgment on the SCA claim, asserting that the server became partnership property once the parties started sharing it. Pl. Resp. Def. Mot. Summ. J. and Sanctions 7 n.9, ECF 130 (citing Meyer Dep. 151:18-152:25). A jury could reasonably conclude that Plaintiff Meyer did not believe he had the right to access Defendants' emails.

Defendants also point out that Plaintiff Meyer accessed Defendant Mittal's emails through a means that would not alert Defendant Mittal. Def. Resp. 9-10. Defendants note, and Plaintiff Meyer agrees, that if an email forwarding rule is used, global administrators receive an email alerting them of the new rule. *Id.* at 9 (citing Meyer Decl. Opp. Part. Summ. J. and Sanctions ¶ 18(e), ECF 133). Defendant Mittal was a global administrator. Likewise, use of Microsoft's built-in eDiscovery tool also sends an alert. *Id.* at 9-10 (citing Aldred Decl. in Support of Defendants' Reply in Support of Mot. Part. Summ. J. and Sanctions, Ex. 35, ECF 142-43). Plaintiff Meyer previously stated that he initiated Microsoft's eDiscovery tool in fall 2021 after he discovered that entire accounts had been deleted from the shared server. Meyer Decl. Status Quo ¶¶ 19-20, ECF 95. That was after he began making the email backups. A jury

could reasonably believe that Plaintiff Meyer used the method he used to back up the emails because he believed he had the right to access the emails but feared that Defendant Mittal would hide or delete incriminating emails if he knew Defendant Meyer had accessed them. A jury could also reasonably believe that Plaintiff Meyer used the method he used to back up the emails because he did not think he had the right to access the emails and wished to avoid detection.

Finally, Defendants note that Plaintiff Meyer downloaded emails of Axeno's executives that predated the possible formation of a partnership in 2017. Def. Resp. 10. When asked how he distinguished emails he believed to be owned by the partnership and those owned by the individual entities, Plaintiff Meyer testified:

> So this joint email server was originally owned by Zap. It's never come up, so I've never had to think about this, so I don't know that we had a way of delineating. I would like to think that any emails that came in before we started sharing this email server belonged to Zap, and then once we start started sharing the email server it belonged to Argil DX.

Meyer Dep. 151:18-25, ECF 109-1. A jury could reasonably conclude from this testimony that Plaintiff Meyer believed that Axeno emails predating the sharing of the server were not partnership property. Defendants submit evidence that Plaintiff Meyer downloaded such emails. Aldred Decl. in Support of Reply to Def. Mot. Summ. J. and Sanctions ¶ 13, ECF 142 (identifying "emails sent to or from Accunity email addresses from 2014 through the end of 2016" that were not sent from or addressed to Plaintiffs).

In denying Defendants' motion for summary judgment on their SCA claim, the Court concluded that questions of fact about Plaintiff Meyer's mental state precluded summary judgment. ECF 164 at 47. The same is true now. Defendants have shown a genuine dispute as to Plaintiff Meyer's mental state. Plaintiffs are not entitled to summary judgment on this claim.

B.      Invasion of Privacy Claim

      i.      Standard

Oregon recognizes the privacy tort of intrusion upon seclusion and follows the Second

Restatement of Torts. *Mauri v. Smith*, 324 Or. 476, 482-83, 929 P.2d 307 (1996). To prevail, "a

plaintiff must prove three elements: (1) an intentional intrusion, physical or otherwise, (2) upon

the plaintiff's solitude or seclusion or private affairs or concerns, (3) which would be highly

offensive to a reasonable person." *Id.* at 483. Plaintiffs' Motion addresses the first two elements.

> A person intrudes by thrusting himself or herself in without invitation, permission,
> or welcome. A person acts intentionally when he or she either desires to cause the
> consequence of an act or believes that the consequence is substantially certain to
> result from the act. By definition, then, an actor commits an intentional intrusion if
> the actor either desires to cause an unauthorized intrusion or believes that an
> unauthorized intrusion is substantially certain to result from committing the
> invasive act in question.

*Id.* at 484. As to the second element, the Second Restatement provides several examples of

private affairs: personal mail, a safe or wallet, or a private bank account. Restatement (Second)

of Torts § 652B, cmt. b (1977). "The intrusion itself makes the defendant subject to liability,

even though there is no publication or other use of any kind of the photograph or information

outlined." *Id. See also Reed v. Toyota Motor Credit Corp.*, 301 Or. App. 825, 833-34, 459 P.3d

253 (2020) (holding that collection of location data from GPS installed in vehicle could

constitute intrusion even though the evidence showed that no one accessed the data).

      ii.      Application

Plaintiffs argue that Defendant Mittal's invasion of privacy claim fails because Plaintiff

Meyer lacked the requisite intent, Defendant Mittal had no expectation of privacy in his emails,

and Plaintiff Meyer did not read any private emails. Pl. Mot. 9-13. The Court concludes that

Plaintiffs are not entitled to summary judgment on this claim.

a.    Intentional Intrusion

Plaintiffs have not shown the absence of a genuine dispute as to whether Plaintiff

Meyer's act of downloading Defendants' emails was an intentional intrusion. It is undisputed

that Plaintiff Meyer deliberately downloaded the emails. As discussed above and in the Court's

previous Opinion and Order, there is a genuine dispute as to whether he had the right to access

Defendants' emails and as to whether he believed he had the right to access Defendants' emails.

A jury could reasonably conclude that Plaintiff Meyer intentionally intruded in Defendants'

emails by downloading them. Consistent with *Reed*, a jury could find an intrusion even if

Plaintiff Meyer never read any of the emails he downloaded.

In arguing that there is no evidence of intent, Plaintiffs rely on *Smith v. City of Corvallis*,

No. 6:14-CV-01382-MC, 2016 WL 3193190, at *9 (D. Or. June 6, 2016). In *Smith*, the plaintiffs

were homeless individuals who sued the City of Corvallis for confiscating and disposing of their

personal property. *Id.* at *1. The district court dismissed the plaintiffs' intrusion upon seclusion

claim because "there are no allegations that the defendant intended or attempted to gain or glean

any private information about the plaintiffs by seizing their property. Rather, the plaintiffs'

allegation is that their property was seized and then *discarded.*" *Id.* at *9. Here, however, there is

evidence that Plaintiff Meyer retained the emails he downloaded and read at least some of them.

b.    Private Affairs

Plaintiffs' main argument is that the emails were not private because they were business

correspondence that was not personal to Defendant Mittal. Pl. Mot. 11-13. Defendants disagree.

Def. Resp. 15-17. Both parties rely on cases addressing the Fourth Amendment's reasonable

expectation of privacy standard. Because that standard does not apply to intrusion upon seclusion

claims under Oregon law, Fourth Amendment cases are an imperfect guide.

In *Reed*, the Oregon Court of Appeals found instructive a case addressing searches and seizures under Article I, section 9 of the Oregon Constitution, and applied those principles in resolving the plaintiff's intrusion upon seclusion claim. 301 Or. App. at 834-35 (discussing *State v. Campbell*, 306 Or. 157, 759 P.2d 1040 (1988)). In *Campbell*, the Oregon Supreme Court held that the reasonable expectation of privacy standard of Fourth Amendment jurisprudence did not apply to interpreting Article I, section 9 of the Oregon Constitution. 306 Or. at 164. "[T]he privacy protected by Article I, section 9, is not the privacy that one reasonably *expects* but the privacy to which one has a *right*." *Id.* (emphasis in original). Citing Fourth Amendment cases, the Oregon Supreme Court also stated that "individual freedom from scrutiny is determined by social and legal norms of behavior, such as trespass laws and conventions against eavesdropping." *Id.* at 170 (citing *Katz v. United States*, 389 U.S. 347, 350-51 (1967); *United States v. White*, 401 U.S. 745, 786 (1971) (Harlan, J., dissenting)). Such norms, while relevant, "cannot govern the scope of the constitutional provision." *Id.* at 171. *See also Reed*, 301 Or. App. at 835-836 (finding social and legal norms of behavior as discussed in *Campbell* relevant to the intrusion upon seclusion analysis). Based on the foregoing, the Court concludes that cases addressing a Fourth Amendment privacy interest in corporate email or corporate servers are useful here but do not provide a perfect guide.

No Oregon cases on intrusion upon seclusion address facts similar to those alleged here. In the Fourth Amendment context, federal courts have addressed whether there is a privacy interest in work or business emails or corporate servers. *E.g.*, *United States v. Nagle*, 803 F.3d 167, 176-77 (3d Cir. 2015), *cert denied*, 577 U.S. 1144, 136 S. Ct. 1238 (2016); *United States v. SDI Future Health, Inc.*, 568 F.3d 684 (9th Cir. 2009); *Kelleher v. City of Reading*, No. CIV.A.01-3386, 2002 WL 1067442, at *8 (E.D. Pa. May 29, 2002).

In *Nagle*, the defendant, a co-owner and executive of a concrete manufacturing and construction business, was prosecuted for fraudulent acts related to his business dealings. 803 F.3d at 171. During the criminal investigation, the FBI executed two search warrants at the business's offices; the warrants authorized the seizure of business documents and emails. *Id.* at 173. The defendant's motion to suppress the electronic evidence seized from the company offices was denied because he did not show that he had a reasonable expectation of privacy in his employees' work computers. *Id.* at 173-74. Reviewing caselaw from other circuits, the Third Circuit concluded that to challenge the search, the defendant "must show a personal connection to the place searched or to the item seized and that he attempted to keep the place and item private." *Id.* at 178. The defendant could not challenge the seizure of his employees' computers because he did not show that he used his employees' offices or computers or accessed their files. *Id.* With respect to the company server, the defendant failed to show a personal connection to other employees' electronic files, and while he could show a personal connection to his own files and emails on the server, "he failed to show what efforts he made to keep *his* materials private from others." *Id.* The Third Circuit held that it was not enough for the defendant to show that the server was password protected and only five individuals could access all drives on the server, as the defendant failed to establish where his files and emails were located on the server and how many people had access to those drives. *Id.* at 178-79.

Among other cases, *Nagle* relied on the Ninth Circuit case *SDI Future Health*. In *SDI Future Health*, the IRS investigated the defendant corporation for Medicare fraud. 568 F.3d at 691. IRS special agents executed a search warrant at corporate headquarters, seizing business records including email. *Id.* at 692-93. The owners and managers of the defendant challenged the search and seizure. *Id.* at 693. The Ninth Circuit stated that they could not bring a Fourth

Amendment claim merely by virtue of their status as owners and managers of the corporation. *Id.* at 696. Rather, the Ninth Circuit looked at three non-exclusive factors to determine whether the owners and managers had the requisite personal connection with the places searched and items seized:

> (1) whether the item seized is personal property or otherwise kept in a private place separate from other work-related material; (2) whether the defendant had custody or immediate control of the item when officers seized it; and (3) whether the defendant took precautions on his own behalf to secure the place searched or things seized from any interference without his authorization.

*Id.* at 698. Because the officers and managers could not show exclusive use of the places searched, the Ninth Circuit remanded for fact-finding on whether they could show a personal connection. *Id.* at 698-99.

The Court first concludes that Defendant Mittal as an individual can only challenge Plaintiff Meyer's downloading of his own emails, not the emails of his employees or other executives. While other Axeno executives previously submitted declarations stating that they did not authorize Plaintiff Meyer to download his emails and were surprised to learn that he had done so, ECF 164 at 11, there is no evidence that Defendant Mittal might have a privacy interest in emails besides his own. Both Defendant Mittal and Defendant Axeno asserted this claim against Plaintiffs, Am. Answer ¶¶ 344-348. The parties do not address whether a business entity can bring a claim for invasion of privacy under Oregon law. The Court therefore declines to address the issue and will allow Defendant Axeno's claim to proceed at this time.

Plaintiffs argue that Defendant Mittal's business emails were not personal to him but rather the property of the business. Pl. Mot. 12-13. They point out that Defendant Mittal had a personal Gmail account in addition to his Axeno email account and used the accounts for different things. *Id.* at 5 (citing Williams Decl. Ex. A, Mittal Dep. 136:7-16). And they point to

Defendant Axeno's employee handbook, which states that emails are the property of the organization. *Id.* at 6 (citing Williams Decl. Ex. B). Defendant Mittal testified that Axeno employees were asked to sign a copy of the employee handbook when they started work. Williams Decl. Ex. B, Mittal Dep. 176:24-177:5. Plaintiffs argue that this case is like *Kelleher v. City of Reading*, No. CIV.A.01-3386, 2002 WL 1067442, at *8 (E.D. Pa. May 29, 2002). In *Kelleher*, the plaintiff, a city clerk, sued the mayor's assistant for invasion of privacy for publicizing her work emails. *Id.* at *1. The district court held that the plaintiff had no reasonable expectation of privacy in her work emails because the city guidelines provided that emails sent using the city's email system were the property of the city, and the plaintiff signed an acknowledgment of those guidelines. *Id.* at *8. Defendants counter that Plaintiffs have provided no evidence that Defendant Mittal signed the handbook, and state that Defendant Mittal never signed the employee handbook because he was an executive. Def. Resp. 13-14. Defendants are correct that there is no evidence that Defendant Mittal signed the handbook. *Kelleher* is not persuasive here.

Plaintiffs argue that Plaintiff Meyer did not seek or see private information because all of the emails he viewed were business emails. Pl. Mot. 7-8; Pl. Reply 5-8. Defendants identify several emails they argue are private, including emails Defendant Mittal exchanged with alleged tax attorneys at Nangia Andersen, other Axeno executives, and a lawyer at LegalZoom. Def. Resp. 13. The Court rejects Plaintiffs' suggestion that corporate matters cannot be private as to an individual corporate officer. *See* Pl. Reply 5. In *Nagle*, the Third Circuit (relying in part on Ninth Circuit caselaw) indicated that a corporate officer could show a privacy interest in corporate emails. 803 F.3d at 178. The defendant in *Nagle* did show a personal connection to his own corporate emails; the problem with his claim was that he failed to adequately show that he

had kept them private. *Id.* at 178-79. Plaintiffs have identified nothing in Oregon caselaw suggesting that a corporate officer cannot bring an invasion of privacy claim based on intrusion into his or her business correspondence. The emails Defendants describe are the sort of business correspondence that could fall within the scope of such a claim.

Plaintiffs argue that Defendant Mittal did not act to keep his emails private. They state, "Mr. Mittal made no effort, via letter, email, or motion in this Court to stop Mr. Meyer from viewing backups. Mr. Mittal made no effort to ask of Mr. Meyer whether he was viewing emails and if so what emails he was viewing." Pl. Mot. 6. They point to Defendant Mittal's testimony that he did not communicate with Plaintiff Meyer about informational alerts triggered on the server or whether Plaintiff Meyer was reading his emails. *Id.* at 6-7 (citing Mittal Dep. 159:20-25, 225:6-10). Defendants counter that Defendant Mittal's actions showed he had reason to expect his emails were private, pointing to a 2017 conversation he had with Plaintiff Meyer in which he stated he did not want a Zap employee to access his emails, his demand that Plaintiff Meyer stop accessing the emails, his decision to move the emails to another server, and his decision to bring the invasion of privacy and SCA claims. Def. Resp. 16-17.

Defendant Mittal provides limited evidence that he intended to keep his business emails private from Plaintiff Meyer. Most of the evidence consists of his response upon finding out that Plaintiff Meyer had accessed his emails after the parties' business relationship had gone sour. Other than this, he relies on a 2017 chat conversation between himself and Plaintiff Meyer. The Court addressed this conversation in denying Defendants' motion for summary judgment on their SCA claim. ECF 164 at 33. The Court noted that the conversation did not address whether Plaintiff Meyer (as opposed to a particular Zap employee) would be permitted to access Defendant Mittal's emails. *Id.* The Court stated, "[T]here is no evidence that Plaintiff Meyer and

Defendant Mittal agreed that their emails either would or would not be private from each other."
*Id.* at 33-34. In the 2017 chat conversation, Defendant Mittal stated, "I think office 365 allows
impersonation. And if that is there, it is not right. Legally as well." Mittal Reply Decl. Ex. 32,
ECF 141. Plaintiff Meyer responded that he looked into the issue, and said, "I cannot
impersonate anyone unless I go into administration and set it up for each user that I want to be
able to impersonate. That said, it's very common (and expected) for IT to administer systems
which contain sensitive information." *Id.* A jury could conclude from this chat conversation that
Defendant Mittal believed he did not need to worry that Plaintiff Meyer might access his emails.

The Court recognizes that the *Nagle* and *SDI* courts imposed more demanding
requirements on the corporate officers seeking to assert privacy interests. Cases such as *Nagle*
and *SDI* are not a perfect guide here because they both rely on the Fourth Amendment standard.
In *Nagle*, for instance, the defendant's privacy argument failed because he failed to show a
subjective expectation of privacy. 803 F.3d at 178-79. A subjective expectation of privacy does
not appear to be a requirement of an invasion of privacy claim under Oregon law. As discussed
above, Oregon constitutional law, which the Oregon Court of Appeals has used as a guide in the
invasion of privacy context, focuses on rights rather than expectations. Viewing the facts in the
light most favorable to Defendants, there was no partnership between Plaintiffs and Defendants;
rather, Defendant Axeno was a contractor of Plaintiff Zap. While courts may hesitate in finding
that an employee has a privacy interest in his or her work emails, the Court believes that society
generally recognizes that one business entity has a right to privacy in its emails as asserted
against another business entity. On this record, a jury could conclude that Defendant Mittal had a
privacy interest in his emails even if Plaintiffs Zap and Axeno were sharing an email server.

Thus, Plaintiffs are not entitled to summary judgment on this claim. The Court turns now to Defendants' Motions for Summary Judgment.

## II.    Defendants' Motions for Summary Judgment

### A.    Unclean Hands

Defendants argue that Plaintiffs' equitable claims relating to the EY contracts are barred by the doctrine of unclean hands. Def. Second Mot. 2. The Court concludes that material issues of fact preclude summary judgment on this affirmative defense.

#### i.    Standard

Behind the doctrine of unclean hands is the principle that "he who comes into equity must come with clean hands." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). "[W]hile equity does not demand that its suitors shall have led blameless lives as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue." *Id.* at 814-15 (internal quotations and citation omitted). "The doctrine bars relief to a plaintiff who has violated conscience, good faith or other equitable principles in his prior conduct, as well as to a plaintiff who has dirtied his hands in acquiring the right presently asserted." *Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*, 890 F.2d 165, 173 (9th Cir. 1989). The alleged misconduct must "relate directly to the transaction concerning which the complaint is made." *Id.* (internal quotations omitted). While the party seeking the application of the doctrine need not show actual harm to itself or the public caused by the opposing party's conduct, the extent of harm "is a highly relevant consideration." *Republic Molding Corp. v. B. W. Photo Utilities*, 319 F.2d 347, 349-50 (9th Cir. 1963).

Unclean hands "does not stand as a defense that may be properly considered independent of the merits of the plaintiff's claim . . .. Its assertion does not eliminate the need for the court to

ascertain the soundness of the plaintiff's claim." *Id.* at 350. "[T]he court must weigh the substance of the right asserted by plaintiff against the transgression which, it is contended, serves to foreclose that right. The relative extent of each party's wrong upon the other and upon the public should be taken into account, and an equitable balance struck." *Id.*

        ii.      Application

           a.      Scope of Affirmative Defense

The parties dispute the extent to which the unclean hands defense may apply to Plaintiffs' claims. Defendants assert that it applies to Plaintiffs' claims for an accounting, constructive trust, disgorgement of profits, injunctive relief, and breach of fiduciary duty. Def. Second Mot. 10-11 (citing *Northbay Wellness Group v. Beyries*, 789 F.3d 956, 961 n.7 (9th Cir. 2015)). Plaintiffs counter that the determination of whether a claim is legal or equitable is made on a case-by-case basis and that a claim for breach of fiduciary duty may be legal. Pl. Resp. 17 n.16. In *Northbay Wellness*, the Ninth Circuit noted that a claim for breach of fiduciary duty was equitable. 789 F.3d at 961 n.7 (citing *Stebbins v. Crocker Citizens Nat'l Bank (In re Ahlswede)*, 516 F.2d 784, 788 (9th Cir. 1975)). *Stebbins*, in turn, stated, "the [Supreme] Court indicated that before a bankruptcy court may disallow or subordinate a claim, some basis must exist of the sort traditionally cognizable by equity as justifying its intervention, such as fraud, breach of fiduciary duties . . .." 516 F.2d at 788. The Court interprets the two cases to provide that under federal law, a claim for breach of fiduciary duty is cognizable in equity, not that it is exclusively equitable. The Ninth Circuit has also stated that "where legal claims tried by the jury and equitable claims tried by the court are based on the same set of facts, the Seventh Amendment requires the trial judge to follow the jury's implicit or explicit factual

determinations." *Sanders v. City of Newport*, 657 F.3d 772, 783 (9th Cir. 2011) (internal quotations omitted).

Plaintiffs cite Oregon cases for the proposition that claims for breach of fiduciary duty may be legal or equitable. *See Prehall v. Weigel*, 232 Or. App. 148, 158, 221 P.3d 157 (Or. App. 2009); *Kollman v. Cell Tech Int'l, Inc.*, 250 Or. App. 163, 171, 279 P.3d 324 (Or. App. 2012). Under Oregon law, courts look to the pleadings to determine whether claims are legal or equitable; if adequate legal relief is available, the court will not invoke its equitable jurisdiction. *Prehall*, 232 Or. App. at 158 (concluding that claim for breach of fiduciary duty was legal where the plaintiff sought money damages); *Kollman*, 250 Or. App. at 171 (same).

Plaintiffs' Amended Complaint alleges in the alternative a breach of the fiduciary duty of loyalty and a breach of the common law fiduciary duty. Am. Compl. ¶¶ 243-256. Plaintiffs allege that "Defendants' breaches of fiduciary duty damaged Plaintiffs and Argil DX in an amount to be proven at trial." *Id.* ¶¶ 250, 255. Plaintiffs also seek a declaration that the rights in the Argil DX brand be deemed to belong wholly to Plaintiff Zap. *Id.* ¶¶ 251, 256. Plaintiffs thus seek both legal and equitable relief. The Court sees no practical difference between state and federal law here. To the extent Plaintiffs seek equitable relief, it is for the Court to determine whether such relief should be granted. To the extent Plaintiffs seek damages, it is for the jury to determine the amount of damages. Because the claims for legal and equitable relief arise under the same set of facts, they will all be heard by the jury and the Court will decide the equitable claims based on the jury's determination of damages. The unclean hands defense applies to Plaintiffs' claims for breach of fiduciary duty to the extent that Plaintiffs seek equitable relief.

//

//

b.    Prematureness of Affirmative Defense

Defendants argue that they are entitled to summary judgment on their unclean hands

defense for claims related to Plaintiff Zap's contracts with EY. Def. Second Mot. 2-3. The record

shows that Plaintiff Meyer sought and obtained contracts with EY without stating or disclosing

that Plaintiff Zap was in a partnership with Defendant Axeno or disclosing that not all

individuals fulfilling the work were employees of Plaintiff Zap. The parties also agree that

Plaintiff Meyer provided EY with incorrect revenue figures when obtaining contracts with EY.

Def. Second Mot. 6-8; Pl. Resp. 14. Defendants assert that Plaintiff Zap "secured those contracts

only through fraudulent inducement of EY. Zap then maintained those contracts through a series

of deliberate lies, thereby breaching its obligations under the contracts, all of which exposed EY

to regulatory scrutiny." Def. Second Mot. 11.

Plaintiffs respond that Defendant Axeno "had extensive knowledge of the negotiation,

existence, and workings of the EY contracts." Pl. Resp. 15. They point to evidence that

Defendants Mittal and Axeno knew that inaccurate information was provided to EY. *Id.* They

also assert that Defendant Axeno benefitted from the relationship between Plaintiff Zap and EY

by deriving income from it. *Id.* at 17. Defendants reply that they did not participate in Plaintiff

Meyer's dishonesty, never saw the contracts, and were not party to them. Def. Reply Second

Mot. 2.

There is evidence in the record supporting Plaintiffs' position. As discussed above,

Plaintiff Meyer emailed Defendant Mittal a draft of a master services agreement with EY in

2018. A jury could believe that Defendant Mittal was not as unaware of the contract terms as he

asserts. In his declaration, Plaintiff Meyer states that Defendant Axeno "was involved in the

negotiation, financial planning, and performance of the EY contracts." Meyer Resp. Decl. ¶ 4a,

ECF 207. He further asserts that Defendant Axeno and EY knew they were working with each other. *Id.* ¶ 4b.[2] He states that Plaintiff Zap and Defendant Axeno exchanged cost and revenue data to determine contract price before entering into any contract with EY. *Id.* ¶ 5. Plaintiff Meyer further states that Defendant Mittal knew that EY required Plaintiff Zap to provide revenue information, knew that Plaintiff Zap's revenues would not meet EY's requirements, and knew that Plaintiff Zap was providing inaccurate information to EY. *Id.* ¶ 6. Plaintiff Meyer explains that he regularly discussed these issues with Defendant Mittal, who did not suggest that accurate information be provided to EY or refuse to accept income derived from work for EY. *Id.* ¶¶ 7-8. In his deposition, Plaintiff Meyer discussed a written exchange he had with Defendant Mittal in September 2018 regarding a prospective contract with EY. Meyer Resp. Decl. Ex. M, Meyer Dep. 414:14-20. Plaintiff Meyer wrote to Defendant Mittal, "We need about 1.5 million more for revenue for 2018 in order to meet their 40 percent requirement." *Id.* at 415:14-16. Defendant Mittal responded, "OMG, oh, my God. Did you do those trades to create revenue on books?" *Id.* at 416:11-12. A jury could infer that Defendant Mittal knew of Plaintiff Meyer's plans to submit false revenue reports to EY and went along with those plans because it was to the benefit of Defendant Axeno. Under those facts, summary judgment is not appropriate. *See Taneja v. Freitas*, No. 2:22-CV-00702-TL, 2023 WL 5974866, at *11 (W.D. Wash. Sept. 14, 2023), *reconsideration denied*, No. 2:22-CV-00702-TL, 2023 WL 6542118 (W.D. Wash. Oct. 6, 2023) (declining to grant summary judgment on defendant's unclean hands defense because the

---

[2] The evidence surrounding EY's termination of its contract with Plaintiff Zap supports an inference that, at least in the latter part of 2021, EY knew that Defendant Axeno was a separate entity from Plaintiff Zap and that Defendant Mittal was an executive of Defendant Axeno. It thus supports Plaintiff Meyer's assertion, which is not admissible evidence of EY's knowledge.

record showed that plaintiff's misrepresentations and omissions in a transaction with a third party benefited defendant).

In sum, a jury could reasonably conclude that Defendants Mittal and Axeno knew that Plaintiffs Meyer and Zap either improperly failed to disclose the partnership to EY, or if no partnership existed, improperly subcontracted work to Defendants Mittal and Axeno. A jury could also reasonably conclude that Defendant Mittal acquiesced in Plaintiff Meyer's falsification of revenue reports to EY. It is premature to grant summary judgment on this defense. The Court must await the jury's factual findings before determining the proper resolution of Plaintiffs' equitable claims. *See Opal Labs, Inc. v. Sprinklr, Inc.*, No. 3:18-CV-01192-HZ, 2021 WL 3713042, at *8 (D. Or. Aug. 19, 2021) (declining to reach the merits of unclean hands defense at summary judgment because the defense would only be relevant if the plaintiff prevailed on the merits of the claim). Defendants are not entitled to summary judgment on their unclean hands affirmative defense.

B.    Fiduciary Duties

Plaintiffs' Amended Complaint alleges in the alternative a breach of the fiduciary duty of loyalty under partnership law and a breach of the common law fiduciary duty. Am. Compl. ¶¶ 243-256. The conduct alleged includes misrepresentations regarding project expenses, withholding of material facts, pursing business opportunities belonging to the partnership, stealing trademark rights belonging to the partnership, and diverting the partnership's money and assets. *Id.* ¶ 249. The duty of loyalty claim is based on the existence of a partnership or joint venture, and the common law claim is an alternative pleading if no partnership or joint venture existed. Defendants move for summary judgment on both theories as to the EY contracts because the contracts with EY were solely in the name of Plaintiff Zap. Def. Second Mot. 13-16. The

Court concludes that Defendants are entitled to summary judgment on the duty of loyalty claim but not the common law fiduciary duty claim.

        i.      Duty of Loyalty Claim

"The only fiduciary duties a partner owes to the partnership and the other partners are the duty of loyalty and the duty of care[.]" O.R.S. 67.155(1). The duty of loyalty includes (a) accounting for any profit or property due to the partnership, including partnership opportunities, (b) refraining from dealing with the partnership in a manner adverse to its interests, and (c) refraining from competing with the partnership before it dissolves. O.R.S. 67.155(2).

Defendants cite several cases for the propositions that only parties and named beneficiaries to a contract can assert rights under the contract and that fiduciary duties to a partnership are limited to the scope of the partnership. Def. Second Mot. 14-15. Plaintiffs counter that most of the cases Defendants cite do not stand for the propositions for which they are cited but provide no alternative statement of the law. Pl. Resp. 10-11. The Court agrees with Defendants. Fiduciary duties are owed only in connection with partnership ventures. *See Delaney v. Georgia-Pac. Corp.*, 278 Or. 305, 310, 564 P.2d 277, *supplemented*, 279 Or. 653, 569 P.2d 604 (1977) ("As partners or joint venturers, plaintiffs and GP owed one another a duty of loyalty, fair dealing and full disclosure in all matters affecting the conduct of the venture's business."); *LG & E Cap. Corp. v. Tenaska VI, L.P.*, 289 F.3d 1059, 1064 (8th Cir. 2002) (collecting cases). *See also Burton Way Hotels, Ltd. v. Four Seasons Hotels Ltd.*, 663 F. App'x 567, 569-70 (9th Cir. 2016) (holding that defendant did not breach fiduciary duty to plaintiff because conduct at issue was outside the scope of the principal-agent relationship).

Defendants argue that the EY contracts were outside the scope of any partnership because only Plaintiff Zap was a party to the contract. Def. Second. Mot. 14. The contracts with EY and

their amendments reflect that only Plaintiff Zap was named as a party. Aldred Decl. Exs. 2 at 1

(listed as Zap Technology Solutions LLC), 4 at 1 (listed as Argil DX, LLC), 6 at 1 (listed as

ArgilDX LLC), 8 at 1 (listed as Argil DX LLC). Most of the contracts did list Defendant Mittal

as a service provider but did not specify that he was associated with Defendant Axeno or any

partnership. *Id.* Ex. 2 at 16, Ex. 3 at 1, Ex. 4 at 14, Ex. 8 at 19. Plaintiffs state that Defendant

Axeno "was calling itself Argil DX" at the relevant time and that "[w]hat Argil DX is will be for

the jury to decide." Pl. Resp. 11. But the contracts themselves list an LLC as the contracting

party. The amendment to the first contract specified that Argil DX LLC was the new name for

Plaintiff Zap. And the questionnaires Plaintiff Meyer filled out list an LLC with the former alias

of "Zap Technology Solutions, LLC," making it clear that he was seeking the contracts on behalf

of Plaintiff Zap, not a partnership. Aldred Decl. Ex. 10 at 3, Ex. 12 at 3, Ex. 13 at 3, Ex. 14 at 3,

Ex. 15 at 3. Even if a partnership existed, it was not a party to the contracts with EY.

Because the record shows that the partnership was not a party to the contracts with EY,

the Court considers whether it was a third-party beneficiary. "For a party to sue as a third party

beneficiary, the third party must show the contract was specifically intended to be for that party's

direct benefit." *Klamath Water Users Ass'n v. Patterson*, 15 F. Supp. 2d 990, 994 (D. Or.

1998), *aff'd sub nom. Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206 (9th

Cir. 1999), *opinion amended on denial of reh'g*, 203 F.3d 1175 (9th Cir. 2000). "The intention to

specifically benefit a third party may be express or implied." *Id.* In *Patterson*, the district court

found that the plaintiff irrigators had failed to show a genuine dispute as to whether they were

intended beneficiaries of a contract between a corporation and the Bureau of Reclamation. *Id.* at

996. The district court stated, "plaintiffs are not parties to the contract and there is no

manifestation of intent by the parties to provide to the many irrigators participating in the project

the right to sue under the contract or veto proposed modifications to it." *Id.* The plaintiffs'

benefit from the contract was incidental and gave them no basis to sue. *Id.*

  Plaintiffs run into a similar problem here. The partnership was not a party to the contract

and is not mentioned in the contracts. Although there is evidence that EY knew it was working

with Defendant Axeno, at least in 2021 after Defendant Mittal began taking steps to set up a

separate operation, there is no evidence that EY knew or even believed that there was a

partnership between Plaintiff Zap and Defendant Axeno when it entered into any of the contracts

with Plaintiff Zap. Plaintiff Meyer did not disclose a partnership in the questionnaires, and

Plaintiffs point to no other evidence that EY knew about the partnership. Plaintiffs suggested at

oral argument that the partnership was disclosed because Defendant Mittal and other employees

of Defendant Axeno were listed as personnel in an addendum to the contracts. But nothing in the

addendum indicated that those individuals were part of a different business entity. A reasonable

jury could not conclude that listing names disclosed a partnership. It is undisputed that EY paid

Plaintiff Zap, which then paid Defendant Axeno. There is no genuine dispute as to whether the

partnership was an intended beneficiary of the contracts between Plaintiff Zap and EY.

  The partnership was neither a party to nor an intended beneficiary of the contracts with

EY, so Plaintiffs' claim against Defendants Mittal and Axeno for breach of the duty of loyalty

under partnership law cannot proceed based on Defendants' conduct surrounding those contracts.

Because the EY contracts were not partnership contracts, the putative partnership has no standing

to sue based on conduct surrounding those contracts. It might have a claim for breach of the duty

of loyalty for failure to offer the EY contracts to the partnership, *see Liggett v. Lester*, 237 Or.

52, 59, 390 P.2d 351 (1964), but such a claim is not the subject of the present Motion. And

Plaintiff Zap, having chosen (through its agent Plaintiff Meyer) to enter into contracts with EY

that excluded the partnership, cannot now challenge Defendants' conduct surrounding the
execution of those contracts as a breach of the duty of loyalty under partnership law. Defendants
are entitled to summary judgment on Plaintiffs' claim for breach of the duty of loyalty on a
partnership theory as it applies to the EY contracts.

ii.    Common Law Fiduciary Duty Claim

Plaintiffs' second theory does not rely on the existence of a partnership but rather on the
common law fiduciary duty. "To recover for breach of fiduciary duty, the plaintiff must prove,
one, the existence of a fiduciary relationship between the parties; two, a breach of one or more of
the fiduciary duties arising out of that relationship; and three, damage to the plaintiff resulting
from a breach of one or more of those duties." *Evergreen W. Bus. Ctr., LLC v. Emmert*, 254 Or.
App. 361, 367, 296 P.3d 545 (2012), *rev'd on other grounds*, 354 Or. 790, 323 P.3d 250 (2014).
No fiduciary duties are implied unless the parties are in a "special relationship." *Bennett v.
Farmers Ins. Co. of Oregon*, 332 Or. 138, 160, 26 P.3d 785 (2001). A special relationship may
exist between many professionals, such as lawyers, engineers, and architects, and their clients.
*Onita Pac. Corp. v. Trustees of Bronson*, 315 Or. 149, 160-61, 843 P.2d 890 (1992). An agent
also owes a duty of care to the principal. *Id.* at 161. In such situations, the professional or agent
"is, at least in part, acting to further the economic interests of the 'client,' the person owed the
duty of care." *Id.* The special responsibility arises "because the party who is owed the duty
effectively has authorized the party who owes the duty to exercise independent judgment in the
former party's behalf and in the former party's interests." *Conway v. Pac. Univ.*, 324 Or. 231,
240, 924 P.2d 818 (1996). In contrast, relationships such as that of employer and employee
generally do not constitute a fiduciary relationship. *Id.* at 243.

Defendants assert that Defendant Axeno was only a subcontractor to Plaintiff Zap on the EY contracts. Def. Second Mot. 16. Defendants argue that this contractor-subcontractor relationship was not a special relationship. *Id.* (citing *Conway*, 324 Or. at 243; *Abraham v. T. Henry Const., Inc.*, 217 P.3d 212, 217 (Or. App. 2009) (finding no special relationship between plaintiffs and company contracted to build them a home), *aff'd* 249 P.3d 534 (Or. 2011)). They also point out that under the EY contracts, Plaintiff Zap had no authority to delegate any of its obligations to Defendant Axeno without prior written consent from EY. *Id.* (citing Aldred Decl. Ex. 6 at 17). Plaintiffs counter that a special relationship existed because one party was acting to further the economic interests of the other party. Pl. Resp. 11 (citing *Vanderselt v. Pope*, 155 Or. App. 334, 341-42, 963 P.2d 130 (1998)). Defendants reply that Plaintiffs have taken a quote from *Vanderselt* out of context. Def. Reply 7. They argue that simply acting to further the economic interests of a party is not enough; one party must exercise independent judgment on behalf of the other. *Id.* Defendants' position is consistent with the caselaw discussed above.

The most illustrative case here is *Eulrich v. Snap-On Tools Corp.*, 121 Or. App. 25, 853 P.2d 1350 (1993), *cert. granted, judgment vacated on other grounds*, 512 U.S. 1231 (1994), which concerned a relationship between a manufacturer and a dealer of tools. The Oregon Court of Appeals stated that such a relationship would ordinarily not be a fiduciary relationship. *Id.* at 36. In *Eulrich*, however, there was evidence of "ongoing, intensive supervision" of the plaintiff, "extensive funding and financing" of the plaintiff, and promises to "take care of" the plaintiff. *Id.* at 36-37. The record supported a finding of a special relationship. *Id.* at 37. Here, Plaintiffs assert that the common brand of Argil DX—if no partnership existed—could constitute a special relationship. Pl. Resp. 11. As an example, they point to evidence that Defendant Mittal believed that he could use Plaintiff Meyer's picture for marketing purposes. *Id.* at 11-12. Defendants

counter that Plaintiffs have not tied the common branding and marketing to the relationship between Plaintiff Zap and EY. Def. Reply 8.

As discussed above, a reasonable jury could conclude that the parties formed a partnership. Even if there was no partnership, the parties agree that they engaged in common branding and marketing. They shared a website, social media presence, software access, and domain name for email. Their relationship was closer than a typical contractor-subcontractor relationship. In the context of that relationship, Defendant Mittal and employees of Defendant Axeno worked on the EY contracts. The record could support a finding that there was a special relationship between the parties. Defendants' argument that the common branding is not tied directly to the EY contracts misses the mark. Plaintiffs need not tie the branding to the contracts; they need only show a triable issue of fact as to whether a special relationship existed and whether Defendant Axeno did the work on the EY contracts in the context of that relationship. They have met that burden. Defendants do not address the other elements of a claim for breach of fiduciary duty. They have not shown that they are entitled to summary judgment on this claim.

In sum, Defendants are entitled to summary judgment on Plaintiffs' claim for breach of the duty of loyalty under partnership law as concerns the EY contracts. They are not entitled to summary judgment on Plaintiffs' common law claim for breach of fiduciary duty.

    iii. Date Fiduciary Duties Ended

Defendants move for a ruling that they owed no duty of loyalty to any purported partnership after December 3, 2021. Def. Second Mot. 17-20. They base the date on the email Defendants sent to Plaintiffs on December 3, 2021, in which they disagreed that a partnership was formed and "hereby unequivocally terminate[d] that alleged partnership or partnership as perceived by you, effective immediately." *Id.* at 17 (quoting Aldred Decl. Ex. 21).

As stated above, the duty of loyalty requires partners "[t]o refrain from competing with the partnership in the conduct of the partnership business before the dissolution of the partnership." O.R.S. 67.155(2)(c). Oregon's partnership statute lists the ways in which a partnership may be dissolved. O.R.S. 67.290. Relevant here, a partnership dissolves and must be wound up when "[t]here are no longer two or more partners carrying on as co-owners the business of the partnership for profit." O.R.S. 67.290(7). "[A] partnership continues after dissolution only for the purpose of winding up its business. The partnership is terminated when the winding up of its business is completed." O.R.S. 67.295(1). *See also Sandhu v. Kumar*, 317 Or. App. 788, 791-92, 506 P.3d 448 (2022) (holding that dissolved partnership had not terminated because it had not been wound up).

Defendants argue that their December 3, 2021, email dissolved the partnership (if it had not dissolved before that date) and cut off the application of the duty of loyalty. Def. Second Mot. 19. They rely on several Oregon cases decided in the context of Oregon's prior partnership law but with principles that appear to apply equally to the current statute. *See Timmermann v. Timmermann*, 272 Or. 613, 624-25, 538 P.2d 1254 (1975) (holding that an at-will partnership did not dissolve when one of the partners expressed an intent to leave but rather when he stopped participating in partnership business); *Nicholes v. Hunt*, 273 Or. 255, 264, 541 P.2d 820 (1975) (holding that defendant dissolved partnership when he informed plaintiff in a phone call that he was ending the partnership); *Martin v. Martin*, 77 Or. App. 226, 233, 712 P.2d 820 (1986) (holding that partnership dissolved when one partner notified the others that it was terminated). Plaintiffs state that these cases "do not seem to relate to a contested issue in this case." Pl. Resp. 20. They state, "While all of these cases address the effectiveness of a notice of dissolution, none do so in the context of taken property." *Id.*

Defendants' December 3, 2021, email served as effective notice of the dissolution of the partnership. However, that does not resolve the issue. First, as in *Timmermann*, the partnership actually dissolved once Defendants stopped participating in partnership business, even if that was after Defendants sent the email. That date is not established. And Defendants conceded at oral argument that if a partnership existed, it has not been wound up. Second, any misuse or misappropriation of partnership property or other interests acquired before dissolution can still serve as the basis of a claim for breach of the duty of loyalty.

These two conclusions appear to resolve Plaintiffs' main concern. Plaintiffs state, "Assume there are two partners who own magic beans. One partner steals all the magic beans. Beanless, the partnership ends. May the thieving partner now profit from the magic beans without fear of reprisal? Of course not, and the caselaw is clear on this point." Pl. Resp. 19. *Martin* recognized as much. In *Martin*, the partnership, a farm, was dissolved in 1981 when one partner notified the others that the partnership was terminated. 77 Or. App. at 233. But the Oregon Court of Appeals went on to state that "the seeding that was done for the 1982 crop year and the other farming operations that took place after the end of the 1981 crop year involved the use of seed wheat and equipment that was owned as partners by defendants." *Id.* The court held that the defendants were entitled to "the proportion of the profits earned by the use of the partnership assets that relates to their ownership of the assets on the date of dissolution." *Id. See also Fouchek v. Janicek*, 190 Or. 251, 273, 225 P.2d 783 (1950) ("Respondent argues that the duty of a former partner to share profits with his former associates extends only to earnings accruing before the termination of the partnership. The true rule is: When a partner wrongfully snatches a seed of opportunity from the granary of his firm, he cannot, thereafter, excuse himself from sharing with his copartners the fruits of its planting, even though the harvest occurs after

they have terminated their association."). Thus, Defendants' conduct after dissolution may be actionable if it relates to partnership property acquired before dissolution.

On reply, Defendants suggest that Plaintiffs may have other causes of action, but not a claim for breach of the duty of loyalty. Def. Reply 9 n.5. But the duty of loyalty includes the duty "[t]o account to the partnership and hold for it any property, profit or benefit derived by the partner in the conduct and winding up of the partnership business or derived from a use by the partner of partnership property, including the appropriation of a partnership opportunity." O.R.S. 67.155(2)(a). The language of *Martin* and *Fouchek* indicates that a partner has a claim for breach of the duty of loyalty for failure to account for partnership profits as long as those profits derive from partnership property, even if the partnership dissolves before those profits are fully realized. Nothing in the language of Oregon's revised partnership statute or recent cases such as *Sandhu* suggests that this rule is no longer valid. The Court declines to hold that Plaintiffs cannot bring a claim for breach of the duty of loyalty based on events occurring after December 3, 2021.

In sum, the Court denies Defendants' motion to limit the duty of loyalty to the period before December 3, 2021. Defendants' email sent on that date served as effective notice of dissolution of the partnership, but the partnership did not actually dissolve until Defendants ceased participating in partnership activities. That date is unclear. Nor has the partnership been wound up. In any event, Plaintiffs are entitled to seek damages based on Defendants' actions after dissolution when those actions are based on partnership property and interests acquired before dissolution. To the extent that Defendants argue that they were permitted to compete with Plaintiffs after the partnership dissolved, Plaintiffs conceded at oral argument that Defendants could compete with Plaintiffs for new business opportunities, as opposed to the partnership's existing business at the time of purported dissolution.

C.      Disgorgement of Profits

Defendants argue that Plaintiffs should not be permitted to pursue their claim for disgorgement of profits because they did not timely alert Defendants of the claim. Def. Second Mot. 20-23. They also argue that "Plaintiffs have identified no legal theory under which disgorgement of *all profits* earned through the parties' relationship would be an appropriate remedy." *Id.* at 24. The Court concludes that Plaintiffs may seek disgorgement of profits within the parameters outlined below.

        i.      Disclosure of Remedy Sought

Defendants argue that Plaintiffs cannot seek disgorgement of profits because the Amended Complaint does not seek such relief and Plaintiffs failed to disclose calculations of damages for such relief in their initial disclosures. Def. Second Mot. 20-21. They assert Plaintiffs alerted Defendants that they were seeking disgorgement of profits only eleven days before the close of fact discovery. *Id.* at 22. They state that Plaintiffs' expert report included calculations of damages for disgorgement of profits. *Id.* Defendants argue that Plaintiffs' claim for disgorgement of profits should be barred based on this belated disclosure. *Id.* at 23. Plaintiffs counter that the pleadings alerted Defendants that they sought this relief through the request for an accounting. Pl. Resp. 22. They also point to a discovery response identifying the disgorgement sought and state that Defendants had the opportunity to depose Plaintiff Meyer the week after the response and chose not to ask him about the issue. *Id.* at 21.

In the Amended Complaint, Plaintiffs sought an accounting. Am. Compl. ¶¶ 263-267. They asked for the Court to appoint a special master to review Defendant Axeno's books and determine whether any of Defendant Axeno's revenues should have been paid to Plaintiff Zap. *Id.* ¶¶ 266-267. The Court agrees with Plaintiffs that the Amended Complaint notified

Defendants that Plaintiffs were seeking disgorgement of profits. Defendants point to the specific methodology of the accounting sought to argue that an accounting and disgorgement of profits are different remedies. Def. Second Mot. 23. But as the Supreme Court explained in a case Defendants cite, disgorgement of ill-gotten profits is the result of an accounting. *SCA Hygiene Products Aktiebolag v. First Quality Baby Prods., LLC*, 580 U.S. 328, 341 (2017).

The parties also agree that Plaintiffs disclosed that they were seeking disgorgement of profits by email and in a discovery response near the close of fact discovery. Aldred Decl. Exs. 23, 24. Defendants were on notice that Plaintiffs sought disgorgement and had the opportunity to depose Plaintiff Meyer. In her opening report, Plaintiffs' expert calculated the amount of revenue and net profit Defendant Axeno earned. *Id.* Ex. 20 ("Couch Report") at 4. Defendants had the opportunity to rebut this report. For these reasons, and those addressed below in discussing the appropriateness of the remedy sought, the Court concludes that any late disclosure of the precise contours of the claim did not prejudice Defendants.

ii.     Appropriateness of Remedy

On May 14, 2023, counsel for Plaintiffs informed counsel for Defendants that Plaintiffs were seeking "Zap's share of every last cent of revenue received by the company we are calling Axeno for the entire time it did business as Argil DX." Aldred Decl. Ex. 23. Plaintiffs also advised they were seeking "[d]isgorgement of all of Axeno's profits from payments it received from Zap during the time period" for which it did business as Argil DX. *Id.* On May 19, 2023, Plaintiffs supplemented their interrogatory responses regarding damages. *Id.* Ex. 24. Plaintiffs stated the following:

> Defendants are liable for disgorgement of their profits (revenue less adjusted expenses) on transactions with Zap itself. One part of this equation can be quantified – the amount of funds received by Axeno from Zap during the time the parties did business as Argil DX. From 2017 to the present, that amount is

approximately $4,600,000. What is not known, for the purposes of these responses, is what Axeno's profits were on that amount. However, Zap knows that its own margin was approximately 35%. If Axeno's margin was the same, the disgorgement would be $1,610,000.

*Id.* at 6.

Defendants argue that no legal theory supports disgorgement of all profits earned through the parties' collaboration. Def. Second Mot. 24. They argue that there are no allegations that all of Defendant Axeno's profits were wrongfully earned. *Id.* They point to allegations in the Amended Complaint that the parties formed a partnership and intended to share profits 50-50. *Id.* (citing Am. Compl. ¶¶ 56, 66, 68, 79). Defendants then assert that "[u]nder Plaintiffs' theory of the case, Axeno is entitled to keep half of the collective profits earned by both companies." *Id.* They assert that "[t]he only 'ill-gotten' gains would be (1) profits from projects that Axeno performed without Zap, and for which it did not share profits, and (2) profits made by allegedly misrepresenting expenses[.]" *Id.* Defendants rely on *Tull v. United States*, 481 U.S. 412, 424 (1987) (characterizing "disgorgement of improper profits" as restitution) and *SCA Hygiene Products*, 580 U.S. at 341 (stating that an accounting seeks "disgorgement of ill-gotten profits").

Plaintiffs state that "[a]n unfaithful fiduciary may be required to disgorge the profits it made during the time it was a fiduciary." Pl. Resp. 21. They rely on several nonbinding authorities. *Id.* at 21 n.18 (citing *Risvold, on Behalf & for Use & Benefit of Cleary Hill Mines Co. v. Gustafson*, 209 Minn. 357, 296 N.W. 411 (1941); *Henderson v. Hassur*, 225 Kan. 678, 594 P.2d 650, 659 (Kan. 1979); *McDonald v. O'Meara*, 473 F.2d 799, 805 (5th Cir. 1973)). In *Risvold*, the Supreme Court of Minnesota upheld a judgment requiring the defendants to disgorge secret profits. 296 N.W. at 412-13. Similarly, in *Henderson*, the Supreme Court of Kansas held that the defendant agent was required to disgorge to the principal the secret profits he made by marking up property without the principal's knowledge. 594 P.2d at 659. And in *McDonald*, the

Fifth Circuit stated that "whatever the agent servant/fiduciary wrongfully acquires during the fiduciary relationship must be disgorged completely, once and for all." 473 F.2d at 805. These cases, like the cases Defendants cite, stand for the basic proposition that profits wrongfully acquired must be disgorged to the wronged party.

Accordingly, Plaintiffs may seek disgorgement of profits to the extent they can prove that such profits were wrongfully earned. If Plaintiffs seek disgorgement of all profits Defendant Axeno made while collaborating with Plaintiff Zap, they must prove that all of those profits were wrongfully earned. As discussed in *Tull*, disgorgement is a form of restitution, a limited remedy. 481 U.S. at 424. It is not enough for Plaintiffs to show that, as a general matter, Defendant Axeno was unfaithful to Plaintiff Zap during the parties' collaboration. The profits themselves must be wrongfully earned. Defendants have made several arguments as to why Plaintiffs are unlikely to be able to show that all of Defendant Axeno's profits were wrongfully earned. Def. Second Mot. 24. But the Court declines at this time to precisely delineate the amount of profits that Plaintiffs may seek in disgorgement. The Court believes the parameters outlined here are sufficient to guide the parties on this issue for trial.

### D.    Intentional Interference with EY Contracts

Defendants move for summary judgment on Plaintiffs' claim for intentional interference with Plaintiff Zap's contractual relationship with EY. Def. Second Mot. 24-35.

> To state a claim for intentional interference with economic or contractual relations, a party must allege each of the following elements: (1) the existence of a professional or business relationship, (2) intentional interference by the third party with the relationship, (3) that the interference was accomplished through improper means or for an improper purpose, (4) the interference caused damage to the economic relationship, and (5) damages.

*Adelsperger v. Elkside Dev. LLC*, 371 Or. 61, 73, 529 P.3d 230 (2023). Defendants raise five arguments in favor of summary judgment: (1) the claim was not pleaded, (2) Plaintiffs fail to

identify an improper means or motive, (3) Plaintiffs were unable to perform the contracts, (4) Plaintiff Zap secured the contract with EY through fraud, and (5) Plaintiffs have no evidence that EY would have entered into future contracts with Plaintiff Zap. *Id.* at 25. The Court concludes that Defendants are not entitled to summary judgment on this claim as to the then-existing contract between Plaintiff Zap and EY, but they are entitled to summary judgment as to Plaintiff Zap's expectation of future contracts with EY.

    i.   Whether the Claim Was Pleaded

  Defendants first argue that Plaintiffs' intentional interference claim is unpleaded. Def. Second Mot. 30. "A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint "does not need detailed factual allegations" but cannot rely on "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).

  The Amended Complaint included a claim for intentional interference with economic relations. Am. Compl. ¶¶ 187-196. Defendants argue that this claim is insufficient because it alleges harm to Argil DX, the putative partnership, rather than to Plaintiff Zap. Def. Second Mot. 27. As discussed above, Plaintiff Zap, not the partnership, had contracts with EY. Defendants argue that the claim should not be allowed to proceed with alleged direct damages to Plaintiff Zap rather than the partnership. Def. Second Mot. 27-28.

  Defendants cite several cases for the proposition that the Court should not permit new theories of the case at the summary judgment stage. *Id.* (citing *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968-969 (9th Cir. 2006); *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006); *Ramirez v. Reeve-Woods Eye Center*, 2014 WL 2807638, at *3

(E.D. Cal. June 20, 2014); *Diaz v. Tester*, 2023 WL 3881370, at *4 (D. Or. March 6, 2023)). In

*Pickern*, the plaintiff brought a claim under the Americans with Disabilities Act ("ADA") for

failure to provide a ramp, but introduced new factual allegations about different ADA violations

in response to the defendant's motion for summary judgment. 457 F.3d at 968. The Ninth Circuit

held that the district court properly found inadequate notice of the new claims because they were

not in the complaint, and the "preliminary site report" the plaintiff gave to the defendant during

settlement negotiations was not part of the record and did not serve as notice of the new claims.

*Id.* at 969. In *Wasco Products*, the plaintiff failed to allege a conspiracy in its complaint but

sought to rely on one to toll the statute of limitations. 435 F.3d at 990. The Ninth Circuit held

that the plaintiff could not toll the statute of limitations based on a conspiracy theory. *Id.* at 992.

The Ninth Circuit subsequently held that an argument made in opposition to a motion for

summary judgment that is outside the scope of the complaint is construed as a motion to amend

the pleadings under Federal Rule of Civil Procedure 15. *Desertrain v. City of Los Angeles*, 754

F.3d 1147, 1154 (9th Cir. 2014). Once the period for amending pleadings as a matter of course

has elapsed, "a party may amend its pleading only with the opposing party's written consent or

with the court's leave." Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice

so requires." *Id.* However, the court need not grant leave to amend where the amendment "(1)

prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in

litigation; or (4) is futile." *AmerisourceBergen Corp. v. Dialysist West, Inc.*, 465 F.3d 946, 951

(9th Cir. 2006). "[T]he consideration of prejudice to the opposing party carries the greatest

weight." *Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma Cnty.*, 708 F.3d 1109, 1117 (9th Cir.

2013) (internal quotations omitted). Amendments that add causes of action or legal theories

requiring further discovery may prejudice the opposing party. *Ascon Properties, Inc. v. Mobil Oil*

*Co.*, 866 F.2d 1149, 1161 (9th Cir. 1989); *Zivkovic v. S. California Edison Co.*, 302 F.3d 1080, 1087 (9th Cir. 2002).

In *Desertrain*, the Ninth Circuit held that the district court should have considered the plaintiffs' vagueness challenge to a provision of the Los Angeles Municipal Code that was not alleged in the pleadings. 754 F.3d at 1154. There was no undue delay because the defendants only provided key documents about their enforcement policies late in the discovery period, so the plaintiffs did not fully understand the issues until then. *Id.* There was no prejudice to the defendants because repeated questioning in depositions about limiting criteria for enforcement put the defendants on notice of the claim, and plaintiffs' counsel then emailed defense counsel weeks before the parties filed cross motions for summary judgment to advise that plaintiffs would raise a vagueness challenge, and again notified defense counsel the day before filing the motion. *Id.* at 1154-55. The issue was fully argued in those motions. *Id.*

The Court concludes that Plaintiffs' amendment of the claim, with Plaintiff Zap as the contracting party rather than the alleged partnership, should be permitted. Defendants state that "at the tail end of discovery, Plaintiffs disclosed for the first time their intention to seek damages directly on behalf of *Zap* for alleged intentional interference with the Zap/EY contracts." Def. Second Mot. 27 (citing Aldred Decl. Ex. 23). While Defendants suggest that they were not on notice of the claim, Def. Reply 13, the record belies this assertion. Plaintiffs raised a claim for intentional interference with economic relations in both the Complaint and the Amended Complaint. Before stating their claims, Plaintiffs included a "Statement Regarding Alternative Direct and Derivative Relief." Am. Compl. ¶¶ 156-165. In this statement, they alleged that Defendants owed Plaintiffs Meyer and Zap duties directly, and that if a partnership was found to exist, duties may be owed to the partnership in the alternative. *Id.* The allegations in the

Amended Complaint put Defendants on notice that Plaintiffs' theories were based on harm to Plaintiffs Zap and Meyer or to the alleged partnership.

Further, Plaintiffs did not introduce an entirely new claim. The claim concerns the same contract and same alleged behavior by Defendants. This is unlike *Pickern* and *Wasco Products*, where the new claims or theories would have required considerable new discovery. Defendants' submissions in support of their Motions include copies of the contracts between Plaintiff Zap and EY, and Defendants thoroughly addressed those contracts in their Motions. Defendants received the discovery necessary to address Plaintiffs' amended theory. Defendants have not shown prejudice. Nor have they shown (or attempted to show) bad faith, undue delay, or futility. The Court therefore proceeds to consider Plaintiffs' intentional interference claim as amended, with Plaintiff Zap as the contracting party.

ii.    Improper Means or Purpose

Defendants argue that Plaintiffs fail to identify an improper means or purpose. Def. Second Mot. 30-31. "Improper means must be independently wrongful by reason of statutory or common law, and include violence, threats, intimidation, deceit, misrepresentation, bribery, unfounded litigation, defamation and disparaging falsehood." *Douglas Med. Ctr., LLC v. Mercy Med. Ctr.*, 203 Or. App. 619, 634, 125 P.3d 1281 (2006) (internal quotations omitted). In short, "the means must be wrongful in some manner other than simply causing the damages claimed as a result of the conduct." *Id.* In showing improper means, the plaintiff need not prove all elements of liability for another tort or statutory violation. *Id.* at 633-34. An improper purpose can be established if the defendant intended to harm the plaintiff. *Top Serv. Body Shop, Inc. v. Allstate Ins. Co.*, 283 Or. 201, 205, 582 P.2d 1365 (1978).

Defendants state, "By the time EY notified Plaintiffs on December 15, 2021 that it was terminating their relationship, Axeno clearly was competing with Zap. Axeno had notified Zap twelve days prior that it was terminating the alleged partnership 'effective immediately,' and had notified Zap that it had intended to pursue its own business independent of Zap." Def. Second Mot. 30-31. This argument relies heavily on Defendants' argument that they owed no fiduciary duty to Plaintiff Zap after December 3, 2021, and could compete with Plaintiff Zap as soon as they sent the December 3, 2021, email terminating the partnership. *See id.* As discussed above, the Court does not find the matter so straightforward. And there is evidence that Defendants secretly communicated with EY prior to December 3, 2021, to take over the contract. Defendant Mittal testified that Defendants "did convey to EY that we would be basically constituting a new brand and exiting Argil DX brand. And we conveyed to them that, you know, of course they are – they have free will to pursue the – you know, work with whoever they like." Williams Decl. Ex. A, Mittal Dep. 341:24-342:3. He stated that he did so before December 3. *Id.* at 342:15-18. The text messages between Defendant Mittal and EY employees indicate ongoing negotiations before December 3, 2021. There is also evidence that Defendant Mittal and other executives of Defendant Axeno were communicating with each other about the form and clauses of the EY contract before December 3, 2021. *Id.* at 349:16-23, 350:8-18. Based on this evidence, a reasonable jury could conclude that Defendant Axeno was competing with Plaintiff Zap for the EY contract before Defendant Axeno terminated the parties' collaboration, in violation of its fiduciary duty to Plaintiffs. That would constitute improper means of interference. Evidence in messages and emails showing Defendant Mittal's displeasure with Plaintiff Meyer, discussed above and in the Court's previous Opinion and Order, could also support an inference that

Defendants acted in part out of ill will toward Plaintiff Meyer. That could be an improper purpose.

### iii.    Ability to Perform the Contract

Defendant argues that Plaintiff Zap cannot prevail on an intentional interference claim because it was unable to perform the EY contracts. Def. Second Mot. 31. Defendant asserts that Plaintiff Zap could not, and never did, meet the revenue ratio requirement in in the contracts, which was 40% for the first contract and 45% in subsequent contracts. It is undisputed that Plaintiff Zap did not meet the revenue ratio requirement and that Plaintiff Meyer provided false revenue figures to EY in the questionnaires.

Defendants cite several cases for the proposition that "a party has no cause of action for intentional interference for a contract they cannot perform." Def. Second Mot. 29 (citing *Johnson v. Holt*, 173 Cal. App. 2d 107, 342 P.2d 398, 401-402 (Cal. App. 1959); *Abbas v. Shurden*, 2016 Ohio Misc. LEXIS 12173, at *5 (Ct. Com. Pl. June 28, 2016); *Sacramento E.D.M., Inc. v. Hynes Aviation Indus.*, 2017 WL 1383289, at *19 n.21 (E.D. Cal. Apr. 18, 2017)). In *Johnson*, a California appeals court held that the plaintiff could not sue the defendants for intentional interference with a contract between the plaintiff and his mother because the plaintiff had breached the contract. 342 P.2d at 401-02. In *Abbas*, a court of common pleas in Ohio held that the plaintiff's claim for tortious interference with a contract failed because the contract was already in default for nonpayment at the time of the alleged interference. 2016 Ohio Misc. LEXIS 12173, at *5. And in *Sacramento E.D.M.*, the district court concluded that the plaintiff failed to prove its claim for tortious interference with an equipment lease contract because the plaintiff had decided to stop making its monthly payments and was in default. 2017 WL 1383289, at *19 n.21.

Plaintiffs argue that the three cases Defendants cite do not apply here because *Johnson* was "more of a one-time transaction" with all parties to the contract before the court, while *Abbas* and *Sacramento E.D.M.* were cases where the contract was already in breach at the time of the alleged interference. Pl. Resp. 18. Plaintiffs' attempts to distinguish these cases are largely unconvincing. The undisputed facts show that Plaintiff Zap could not meet EY's revenue requirement at the time it entered into the contract with EY that Defendants are alleged to have interfered with, so the contract *was* in breach at the time of the alleged interference. And contrary to Plaintiffs' characterization, *Johnson* involved a long-term contract between the plaintiff and his mother that created a joint tenancy with a right of survivorship. 342 P.2d at 399.

Defendants also point to the Second Restatement of Contracts. Def. Reply 15. "[I]t is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time." Restatement (Second) of Contracts § 237 (1981). Under Oregon law, when a contract is materially breached, "the injured party has an election to pursue one of three remedies: he may treat the contract as at an end and sue for restitution, he may sue for damages, or he may sue for specific performance in certain cases." *Mohr v. Lear*, 239 Or. 41, 48, 395 P.2d 117 (1964). "[O]nly a *material* breach entitles a party to rescind a contract." *McPherson v. Dauenhauer*, 187 Or. App. 551, 560, 69 P.3d 733 (2003). Oregon law also provides that a party in material breach of a contract may not sue to enforce that contract because that party cannot show substantial performance. *Holland Devs., Ltd. v. Manufacturers Consultants, Inc.*, 81 Or. App. 57, 65, 724 P.2d 844 (1986).

The Court concludes that Defendants' cases are somewhat persuasive, but declines to adopt a blanket rule that no party in material breach of a contract may maintain a claim for

intentional interference with that contract. Under Oregon law, if one party materially breaches a contract, the other party has the right to rescind the contract. The contract does not automatically terminate. In defending against a claim of intentional interference with a contract, the defendant may assert as an affirmative defense that the contract was in material breach at the time of alleged interference. To succeed on this defense, the defendant must show that the contract was breached, that the breach was material, and that the victim of the breach would have elected not to continue the contractual relationship with the breaching party once it learned of the breach. Defendants have proved the first element. They prevail on the second element on the record as it stands. But they have not proved the third element.

Plaintiffs argue that "Defendants are not entitled to an inference that the contracts were materially breached." Pl. Resp. 18. "To be material, a breach must go to the substance of the contract and defeat the parties' object in entering into it." *McPherson*, 187 Or. App. at 560. Plaintiffs assert, "it can be inferred that EY knew of the inaccuracies and either looked the other way or viewed them as nonmaterial transgressions. Indeed, no one from EY informed Mr. Meyer of a breach or potential breach; nor of a default nor potential default." Pl. Resp. 18 (citing Meyer Resp. Decl. ¶ 10). Defendants counter that such an inference is unreasonable. Def. Reply 16. They note that the contracts between Plaintiff Zap and EY "all had a clause stating that 'The failure of either party to insist . . . upon strict performance of any of the terms or provisions of Agreement, or to exercise any option or election herein, shall not be construed as a waiver of such terms, provisions, options, or elections . . .'" *Id.* (citing Aldred Decl. Ex. 2 at 12). Defendants also assert that no facts in the record allow a jury to infer that EY knew about Plaintiff Zap's breach of the revenue ratio provision, pointing out that Plaintiff Meyer reported false revenue figures to EY. *Id.* Finally, they assert that no facts in the record allow the jury to

infer that EY did not care about the performance of the breached terms. *Id.* at 16-17. They point

to evidence in the record that EY did care about the terms. *Id.* In the questionnaire it sent to

Plaintiff Zap, EY stated that it needed annual revenue information "[t]o determine the materiality

of the potential relationship" and explained that "EY is required to closely monitor relationships

which EY considers material to that other party to avoid having the other party become an

'associated entity', as set forth in independence regulations." *E.g.*, Aldred Decl. Ex. 15 at 2.

Defendants' arguments have merit. The undisputed evidence shows that Plaintiff Zap

could not meet EY's revenue requirements and gave false revenue figures to EY. The record also

establishes that the revenue ratio term was material and therefore that Plaintiff Zap's breach was

material. "Determinations of materiality are generally committed to the trier of fact." *Teegarden*

*v. State ex rel. Oregon Youth Auth.*, 270 Or. App. 373, 381, 348 P.3d 273 (2015). On this record,

there is no factual dispute on materiality. The undisputed evidence shows that EY needed

revenue information to ensure compliance with applicable federal regulations and that it

instituted the revenue ratio requirement to comply with those regulations. EY reserved itself the

right to immediately terminate the contract with Plaintiff Zap if any representations about the

revenue ratio were revealed to be false and advised Plaintiff Zap of this term as part of the

independence questionnaire. The revenue term was material. Plaintiffs present no evidence

supporting a contrary conclusion. They provide no evidence that EY knew or had any basis to

suspect that Plaintiff Zap was not meeting the ratio requirement. Thus, there is no basis for a jury

to infer that EY was looking the other way or did not find the breach material.

However, there is no evidence about how EY would have proceeded had it learned of the

breach. The contract provided that EY had the right to immediately terminate the agreement if

the revenue ratio provision were breached. It did not provide that such a breach would void the

contract. If EY had learned of Plaintiff Meyer's failure to meet the revenue ratio requirement, it might have decided to continue the contractual relationship with Plaintiff Zap for the contract in progress rather than terminate the relationship and find a new contractor. Neither party presents evidence about what EY would have done. Defendants have established that the breach was material, but they have not established that EY would have terminated the contract. Because Defendants have not met their burden of proof on their affirmative defense, Plaintiff Zap's breach of the EY contract is not a basis to grant summary judgment to Defendants on Plaintiffs' intentional interference claim as to the contract with which Defendants interfered.

iv.    Fraud in the Inducement

Similarly, Defendants argue that Plaintiffs cannot proceed on their intentional interference claim because Plaintiff Zap "secured its entire contractual relationship with EY through a pattern of fraud." Def. Second Mot. 31. This argument also relies on the false revenue information given to EY. Defendants assert that a party that procured a contract through fraud cannot maintain an action for intentional interference with that contract. *Id.* at 29 (citing *Renaissance Realty, Inc. v. Soriano*, 120 Cal. App. 3d Supp. 13, 18 (1981); *Cappiello, Hofmann & Katz, P.C. v. Boyle*, 105 Cal. Rptr. 2d 147, 150 (Cal. App. 2001) (unpublished)[3]). In *Renaissance Realty*, the California appeals court held that a fraudulently conceived contractual relationship could not sustain a claim for intentional interference with that contract. 120 Cal. App. 3d Supp. 13, 17-18. The court acknowledged the broad scope of the tort of intentional interference, but concluded, "We must make a distinction between those contractual or business relationships unenforceable because of the statute of frauds, formal defects, lack of consideration

---

[3] *Cappiello* addressed interference with an illegal contract, which is not the precise issue before this Court, as Plaintiffs note. Pl. Resp. 18.

or uncertainty, and those which are invalid because they are illegal or against public policy," and

added fraudulently induced contracts to the latter category. *Id.* at 18.[4] Plaintiffs attempt to

distinguish *Renaissance Realty* on the basis that it concerned a single contract. Pl. Resp. 18. The

Court fails to see how that favors Plaintiffs' position. If anything, a prolonged course of fraud

over a series of contracts points against allowing a claim for intentional interference to proceed.

      The Court appreciates the line *Renaissance Realty* attempted to draw, but concludes that

a less absolute rule is more consistent with Oregon law. Under Oregon law, a party that has been

induced to enter into a contract by a material misrepresentation may rescind the contract.

*Bodenhamer v. Patterson*, 278 Or. 367, 374, 563 P.2d 1212 (1977); *State by & through Bus. Dev.*

*Dep't v. Huttenbauer*, 301 Or. App. 332, 344-45, 456 P.3d 340 (2019). Thus, the party may also

elect to proceed with the contract. This rule is similar to the rule governing material breaches of a

contract. Fraud in the inducement of the contractual relationship is an affirmative defense to a

claim of intentional interference with contractual relations. To succeed on this defense, the

defendant must show that the third party was induced to enter into the contract by a material

misrepresentation, and that once it learned of the misrepresentation, the third party would have

elected to rescind the contract. This formulation of the defense reflects that contracts formed

based on misrepresentation are voidable rather than void.

      The undisputed facts show that Plaintiff Meyer misrepresented Plaintiff Zap's revenue

figures to EY and that the revenue information was material. No facts indicate that EY ever

learned of the misrepresentations. The record shows that Plaintiff Meyer successfully concealed

his deception. Defendants have not produced evidence that EY would have chosen to terminate

---

[4] The Ninth Circuit has favorably cited *Renaissance Realty*, though not for the exact reason for
which Defendants cite it here. *See Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*, 745
F.3d 343, 350 n.3 (9th Cir. 2014).

the contract if it learned of Plaintiff Meyer's misrepresentations. Thus, Defendants are not entitled to summary judgment on the intentional interference claim based on their fraudulent inducement defense.

> v.    Evidence of Future Contracts

Finally, Defendants argue that Plaintiffs have failed to prove that EY would have entered into future contracts with Plaintiff Zap but for Defendants' allegedly tortious conduct. Def. Second Mot. 32. Defendants argue that Plaintiffs have not shown that EY would choose to work with Plaintiff Zap rather than Defendant Axeno because "[a]s of late 2021, Zap was essentially a one-man operation, having sued and fully alienated its labor subcontractor. It had nobody to do the work at the very time EY was needing to enter into a sizeable web maintenance contract for the following year." *Id.* Defendants state that Plaintiffs must also prove that EY would have been willing to waive the revenue ratio requirement "and either waive the 'no subcontractor' clause or pay significantly higher rates for U.S. labor." *Id.* at 33. Defendants rely on *Wash Solutions, Inc. v. PDQ Manufacturing*, 395 F.3d 888 (8th Cir. 2005).

In *Wash Solutions*, the defendant was actively seeking to replace the plaintiff as a distributor at the close of the parties' distributorship agreement, and chose not to renew the agreement, instead entering into an agreement with a different entity. 395 F.3d at 896. The Eighth Circuit found no evidence to suggest that the distributorship agreement would have been renewed but for the different entity's involvement. *Id.* Plaintiffs state, "There is no evidence that EY had alternative candidates and Defendants are not entitled to an inference that there were." Pl. Resp. 10. Plaintiffs also point out that Plaintiff Zap had entered into several contracts with EY of a similar type. *Id.* at 14. They do not otherwise respond to Defendants' arguments.

Up to a point, both parties are correct. EY had entered into several contracts with Plaintiff Zap over a period of several years, and there is no evidence that EY was dissatisfied with Plaintiff Zap or its work product. In the light most favorable to Plaintiffs, but for Defendants' interference, EY would have entered into renewal negotiations with Plaintiff Zap. But Defendants' fundamental argument is that Plaintiff Zap did not have the ability to perform the contracts under their terms and that this would have become apparent to EY during renewal negotiations. It is undisputed that Plaintiff Zap did not meet the revenue ratio requirement. The Court assumes for the purposes of this analysis that EY would obtain true information about Plaintiff Zap's revenue figures. Plaintiffs cannot rely on their past success in hiding Plaintiff Zap's true revenue figures from EY.

Plaintiffs have not shown that they could have performed the work once Defendant Axeno terminated its business relationship with Plaintiffs. The EY contracts listed key individuals who were to perform certain roles, many of whom were employees of Defendant Axeno. The only reasonable inference is that Plaintiff Zap would have needed to provide names of at least some key personnel during negotiations. Plaintiffs do not contest Defendants' characterization of Plaintiff Zap as essentially a one-man operation at the relevant time. They say nothing about how Plaintiff Zap would have been able to do the work. Defendants point to evidence that Plaintiff Meyer was in the process of forming an Indian subsidiary in late 2021, but had not completed the process as of early 2022. Def. Second Mot. 33 n.11 (citing Aldred Decl. Ex. 9, Meyer Dep. 191:16-196:14; Ex. 34 (chat thread regarding formation of subsidiary)). Plaintiffs provide no contrary evidence. There is no evidence that Plaintiffs would have been able to show EY that they could fulfill the contract in terms of the revenue ratio requirement or

personnel to do the work. The only evidence in the record is that Plaintiff Zap would not have been able to do the work.

At oral argument, Plaintiffs appeared to argue that Defendants left them in a position in which they could not complete the contract by abruptly terminating the parties' business relationship and leaving Plaintiffs without the personnel they needed. This argument has merit as to the contract in progress. But Plaintiffs do not dispute that Defendants had the right to end the parties' collaboration, whether it was a partnership or contractor-subcontract relationship. Plaintiffs point to no evidence that they were entitled to rely on Defendants' labor on *future* contracts with EY. Plaintiffs also asserted at oral argument that they had an expectation of business with EY for four years into the future because Plaintiff Zap's contractual relationship with EY had lasted for four years. They provided no legal or factual support for that position. The record does not support it. Plaintiffs have not shown that EY would have entered into future contracts with Plaintiff Zap. In other words, they have not shown that they had a valid business expectancy as to future contracts with EY. For that reason, Defendants are entitled to summary judgment on Plaintiffs' intentional interference claim as to future contracts with EY.

E.    Judicial Estoppel

Defendants argue that Plaintiffs are estopped from claiming that there was a partnership because Plaintiff Meyer asserted in his tax returns, SBA loan application, and EY questionnaire responses that there was no partnership. Def. Seventh Mot. The Court declines to exercise its discretion to estop Plaintiffs from arguing that a partnership existed.

i.    Standard

The doctrine of judicial estoppel provides that "'where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply

because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.'" *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)) (alteration omitted). "[J]udicial estoppel is an equitable doctrine invoked by a court at its discretion" to protect the integrity of the judicial process. *Id.* at 750 (internal quotations omitted). "[F]ederal law governs the application of judicial estoppel in federal court." *Rissetto v. Plumbers & Steamfitters Loc. 343*, 94 F.3d 597, 603 (9th Cir. 1996).

Judicial estoppel may apply outside the context of a position taken in court proceedings. "An inconsistent position taken with an insurance carrier or an employer on the one hand and in a court on the other can result in judicial estoppel." *Est. of Ashman v. Comm'r*, 231 F.3d 541, 543 (9th Cir. 2000). *See also Rissetto*, 343 F.3d at 604 (judicial estoppel applied to statements made in workers' compensation proceedings); *Marks v. Am. Airlines, Inc.*, 313 F. App'x 933, 934 (9th Cir. 2009) (judicial estoppel applied to statements made to state tax board).

While there is no "general formulation of principle" as to when judicial estoppel applies, courts generally consider three factors. *New Hampshire*, 532 U.S. at 750 (internal quotations omitted). "First, a party's later position must be clearly inconsistent with its earlier position." *Id.* (internal quotations omitted). "Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled." *Id.* (citation and internal quotations omitted). And third, courts ask "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 751.

"Additional considerations may inform the doctrine's application in specific factual contexts." *Id.* One such relevant consideration is whether the change in position is the result of "chicanery," though "chicanery or knowing misrepresentation by the party to be estopped is a factor to be considered in the judicial estoppel analysis and not an 'inflexible prerequisite' to its application." *Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983, 995 (9th Cir. 2012).

        ii.      Application

           a.      Plaintiff Meyer's State of Mind

Defendants argue that Plaintiffs are estopped from arguing that a partnership existed, because Plaintiffs Meyer and Zap repeatedly represented—on tax returns, the SBA application, and EY questionnaires—that no partnership existed. Def. Seventh Mot. 12-13. Plaintiffs do not dispute that Plaintiffs Zap and Meyer took an inconsistent position on the existence of a partnership, that the IRS accepted the tax returns characterizing Defendant Axeno as a subcontractor, that the SBA gave Plaintiff Zap a loan based on the application, or that EY entered into multiple contracts with Plaintiff Zap. Instead, they argue that Plaintiff Meyer acted not out of dishonesty but honest error. Pl. Resp. 30.

The Court first addresses the nature of the representations. Plaintiffs assert that Plaintiff Meyer (acting on behalf of Plaintiff Zap) did not make a statement but an omission, and that this supports finding that he merely erred. *Id.* at 22, 23 n.23. The Court disagrees. The relevant federal tax form requires the taxpayer to check either the "Yes" box or the "No" box to answer the question about owning interest in a partnership. *E.g.*, Aldred Decl. Ex. 18 at 2. Checking "No" instead of "Yes" is not an omission because the taxpayer must take the affirmative step of checking "No" rather than "Yes." The SBA loan application likewise required the applicant to

check either a "Yes" box or a "No" box. Aldred Decl. Ex. 48 / 54 at 2. As for the EY questionnaires, in listing himself as CEO of Zap, Plaintiff Meyer put "N/A" in the boxes asking for information about his affiliation with other entities. *E.g.*, Aldred Decl. Ex. 10 at 3-4 (June 2021 questionnaire). He thus took the affirmative step of representing that he had no affiliation with any other businesses or entities. The representations in the tax returns, SBA application, and EY questionnaires were affirmative statements, not omissions.

Plaintiffs argue that Plaintiff Meyer "had no state of mind with respect to the partnership box." Pl. Resp. 30. Plaintiff Meyer asserts that he mistakenly did not indicate the existence of a partnership on his tax returns and SBA loan application. Meyer Resp. Decl. ¶ 12. He states that his accountant provided the forms to him, and he reviewed the numbers, but not the checkboxes. *Id.* ¶ 12(b). He states that he and his accountant did not discuss whether the partnership boxes should have been checked, that his accountant did not raise the issue with him, and that he would have checked the boxes if the accountant had brought the issue to his attention. *Id.* ¶ 12(c). He also states that he would not have taken a contrary position if the IRS had disputed his failure to indicate that a partnership existed. *Id.* ¶ 12(d).

Defendants argue that Plaintiff Meyer's declaration fails to create a genuine dispute of material fact. Def. Reply 6-9. They first point out that Plaintiff Meyer's testimony only states that a box that should have been checked was not checked. *Id.* at 6-7. They point out that Plaintiffs admit that "[a]n affirmative statement cannot be characterized as a mistake." *Id.* at 7 (quoting Pl. Resp. 23 n.23). They also point to Plaintiff Meyer's testimony that he "reviewed the numbers" in the tax forms, asserting that he therefore reviewed Line 19 on the forms, which listed payments to Defendant Axeno as subcontractor expenses. *Id.* They challenge Plaintiff Meyer's assertion that his accountant did not raise the partnership issue, pointing to a

questionnaire his accountant sent him each year that asked whether he had acquired interest in a partnership. *Id.* at 7-8 (citing Aldred Reply Decl. Ex. 109 at 6, ECF 215). And Defendants point to testimony that Plaintiff Meyer did not try to amend his tax returns to include the partnership. *Id.* at 8-9 (citing *Id.* Ex. 107, Meyer Dep. 327:13-15). Defendants also note that Plaintiff Meyer did not explain his failure to disclose the partnership in his EY questionnaires. *Id.* at 7.

The Court concludes that Plaintiff Meyer's statement that he made a mistake does not weigh heavily against an application of judicial estoppel. Even assuming Plaintiff Meyer's declaration is true, it fails to address numerous issues. The record shows that Plaintiff Meyer consistently failed to mention the partnership in his financial documents and dealings. While he stated that his accountant never raised the issue of a partnership, there is no evidence that his accountant had any reason to do so based on the information he received from Plaintiff Meyer. On the other hand, by his own testimony, Plaintiff Meyer did review the numbers for his tax returns, and in doing so, he would have seen the expenses associated with Defendant Axeno listed as subcontractor expenses. Thus, while he might have been unaware of the partnership box itself, he cannot plausibly claim to have been unaware that Plaintiff Zap's tax return treated Defendant Axeno as a subcontractor. Likewise, he does not claim to be unaware that no tax return was filed for the partnership. Finally, his declaration says nothing about his failure to mention the partnership in the EY questionnaires. Even viewing the facts in the light most favorable to Plaintiff Meyer, this situation is one in which judicial estoppel might be appropriate.

In opposing the application of judicial estoppel, Plaintiffs argue that if judicial estoppel applies to Plaintiff Zap's tax returns, it also applies to Defendant ADX's trademark application. Pl. Resp. 28. They argue that in filing the application on behalf of Defendant ADX, Defendant Mittal claimed ownership of the joint website and therefore adopted a statement on the website

to the effect that Plaintiff Zap and Defendant Axeno had merged. *Id.* Defendants counter that Defendant Mittal did not adopt any statements on the website. Def. Reply 11-12. They state that the trademark application included some screen shots from webpages but did not include the webpage announcing the merger. *Id.* at 11. Plaintiffs submitted a copy of the trademark application with the Complaint. Compl. ¶ 124, Ex. 1. The answers to the questions in the application itself do not mention any partnership or merger. *Id.* at 1-4. The application does include five specimen files (each of which was converted from pdf to jpg format). *Id.* at 2. None of those specimen files appears to be the announcement of merger. *See* Compl. Ex. 1 at 8-19. Plaintiffs' argument that Defendant Mittal adopted the statement of merger in the trademark application fails. However, as discussed below, other aspects of Defendants' conduct lead the Court to conclude that estoppel should not apply here.

        b.      Prejudice to Defendants and Benefit to Plaintiffs

Defendants argue that they will be prejudiced by Plaintiffs' inconsistency. Def. Seventh Mot. 14-15. The prejudice element of the estoppel inquiry is "especially" concerned with prejudice to "the party who has acquiesced in the position formerly taken by" the party to be estopped. *New Hampshire*, 532 U.S. at 749 (internal quotations omitted). But the party seeking the application of estoppel need not show detrimental reliance on the prior representations. *See Milton H. Greene Archives*, 692 F.3d at 999 (holding that plaintiff seeking to judicially estop defendant from making contrary representation about domicile did not need to show detrimental reliance and stating that defendant would gain significant benefit from the inconsistent position).

Defendants first assert that if Defendant Axeno were found to be part of a U.S. general partnership, it would face new U.S. tax obligations and penalties for failing to timely pay taxes in the United States, as a foreign partner in particular and as a partner responsible for the

partnership's tax obligations. Def. Seventh Mot. 14-15. Defendants state that if Plaintiffs had notified the IRS of the existence of a partnership in 2017, Defendant Axeno "would have received notice of this assertion through provision of Schedules K-1 and K-3 and Form 8805. Axeno would have had the opportunity at that time to contest and resolve Plaintiffs' assertion that there was a partnership, thus avoiding the potential for penalties and fees." *Id.* at 15. They state that they would have sought different legal advice. *Id.*

Defendants' assertion of prejudice is less than compelling. There is no evidence that Defendant Axeno knew about or relied on Plaintiff Zap's tax filing. While Defendants need not prove that they did, it still weighs against a finding of prejudice, especially because, as discussed below, Defendants may have benefitted from some of Plaintiffs' misrepresentations. If a partnership existed, Defendant Axeno had its own responsibility to file federal taxes accordingly and seek legal advice about its tax obligations. Defendants were aware of the facts that supported the existence of a partnership and could have sought legal advice. They have submitted no evidence that they relied on any professional advice about the nonexistence of a partnership. In essence, Defendant Axeno asserts that it would be prejudiced if Plaintiffs are allowed to argue that a partnership existed because if a partnership is found to exist, Defendant Axeno might be obligated to pay taxes that it should already have paid. In that respect, Plaintiff Zap and Defendant Axeno are similarly situated.

Defendants also argue that Plaintiffs derived benefits from failing to disclose the partnership. *Id.* at 16-22. They argue that Plaintiffs' tax filings were less complex with no mention of a partnership and that Plaintiffs would have needed to change their accounting practices. *Id.* at 16-20. They argue that Plaintiffs reduced the risk of an audit by not mentioning a partnership. *Id.* at 20-21. Defendants submit two articles from the internet about tax audits.

Aldred Decl. Exs. 87, 88. They also rely on a declaration from Daniel Aksel, the accountant who prepared Plaintiff Zap's tax returns in the relevant years. Aksel Decl., ECF 192. Mr. Aksel states that he reported payments to Defendant Axeno as subcontractor payments. *Id.* ¶ 2. He states that if Plaintiff Meyer had ever reported that Plaintiff Zap owned the requisite interest in a partnership, he would have checked the "Yes" box for the question about partnerships on the tax return. *Id.* ¶ 3.

Defendants identify benefits from Plaintiffs' other misrepresentations. They assert that Plaintiff Zap obtained a $75,000 loan based on its SBA application, and the loan was ultimately forgiven. Def. Seventh Mot. 21. Defendants argue that Plaintiff Zap could not have gotten the loan if it had reported the partnership, because it would have needed to produce information about Defendant Axeno that Plaintiffs did not have. *Id.* at 21-22. Finally, Defendants assert that Plaintiffs obtained benefits from their representations to EY because if they had disclosed a partnership, EY would have needed to investigate Defendant Axeno, which "would have at least slowed those engagements[.]" *Id.* at 22.

Plaintiffs argue that the tax consequences of the partnership are speculative. Pl. Resp. 29. They criticize Defendants' evidence as unreliable. *Id.* Plaintiffs agree that partnership tax law is complex. *Id.* At minimum, Plaintiff Meyer would have needed to get more advice on his taxes if he disclosed the partnership to his accountant. On this record, it is speculative what his actual tax burden and audit risk would have been. There is no expert testimony on those issues, and the Court will not rely on the online articles Defendants submitted. As for the SBA loan and EY contracts, Defendants likewise speculate about possible consequences of disclosing the partnership. Defendants have only shown that they may be able to establish that Plaintiffs Zap

and Meyer benefitted from the misrepresentations. They will have the opportunity to prove their case at trial; they have not proved it now.

The Court concludes that judicial estoppel should not apply. It is undisputed that the parties engaged in joint branding and marketing. A jury could conclude that Plaintiff Zap and Defendant Axeno intentionally held themselves out as partners and benefitted financially from doing so. As discussed above, there is evidence that Defendants Mittal and Axeno benefitted financially from Plaintiff Meyer's misrepresentations to EY and may have been complicit in them. Under these circumstances, the Court declines to exercise its discretion to apply judicial estoppel. A jury can listen to the testimony of Plaintiff Meyer and Defendant Mittal and decide whether and to what extent either of them should be believed on the existence of a partnership.

The facts of this case, in which the party seeking estoppel and the party to be estopped may have engaged in the same course of conduct, distinguish it from the cases on which Defendants rely. *See* Def. Seventh Mot. 8-12. Defendants rely on several cases in which the plaintiff received disability benefits and then sought reinstatement of their job. *E.g.*, *Rissetto*, 94 F.3d at 605-06 (holding that plaintiff who received total disability benefits from worker's compensation was estopped from arguing in her employment discrimination suit that she was able to work). Plaintiffs argue that these cases "(a) concern a single issue (b) involve fact patterns where the party asserting the estoppel (the employer) was on the receiving end of the statements; and (c) involve a representation, not an omission." Pl. Resp. 25. Plaintiffs' third argument lacks merit, as discussed above. The first argument also lacks merit, because Defendants seek estoppel on only a single issue: the existence of a partnership or joint venture. Plaintiffs' second argument has more merit. If the party asserting estoppel and the party receiving the alleged misrepresentation are one and the same, there is a direct connection

between the inconsistency and the harm to the party to whom the inconsistency is directed. Defendants do not assert any such harm. They have not shown, for instance, that they relied on Plaintiff Zap's tax filings.

Cases involving estoppel based on representations to tax agencies likewise present situations in which only the party to be estopped was involved in the deceptive conduct. In *Ashman*, the taxpayer falsely represented that certain distributions had been rolled over, thereby avoiding taxation on them. 231 F.3d at 541-42. When she later rolled over those distributions, the IRS sought payment of delinquent taxes, and the tax court held that the plaintiff was bound by the representation in her tax return. *Id.* at 542. The Ninth Circuit affirmed, holding that there was a duty of consistency in filing federal taxes, which "not only reflects basic fairness, but also shows a proper regard for the administration of justice and the dignity of the law." *Id.* at 544. The Ninth Circuit rejected the taxpayer's arguments that she did not make a representation, that the IRS should have audited her return, and that she was correcting an error rather than changing position. *Id.* at 545-46. And in *Marks*, the plaintiff had for years told the California Franchise Tax Board that he was a Florida resident to avoid income taxation, but then claimed to have been a California resident all along when he wanted the protection of California employment law. 313 F. App'x at 934. The Ninth Circuit held that the plaintiff was estopped from claiming that he was a California resident in his employment discrimination suit against the defendant employer, and thus California law did not apply. *Id.*

Here there is evidence that Defendants may have benefitted from some of the misrepresentations. Defendants argue that Plaintiff Zap benefitted from failing to mention its affiliation with other entities because mentioning such affiliations "assuredly would have at least slowed those engagements, because EY would have needed to complete assessments of both the

alleged partnership and other partners." Def. Seventh Mot. 22. Following Defendants' own logic, Defendant Axeno benefitted from the failure to mention the partnership to EY because it allowed Plaintiff Zap to get the EY contract more easily and then pay Defendant Axeno to perform much of the work. And, again following Defendants' logic, Defendant Axeno benefitted from Plaintiff Zap's characterization of it as a subcontractor on the federal tax returns because if Plaintiff Zap had reported a partnership, the IRS could have chosen to investigate and require Defendant Axeno to file a partnership return. Based on the record, a reasonable jury could conclude that Plaintiffs Zap and Axeno formed a partnership and then ignored its legal existence whenever doing so was financially convenient. Applying judicial estoppel under those circumstances will not promote the integrity of the judicial process. In sum, the Court declines to estop Plaintiffs from arguing that a partnership existed. A jury may hear all of the evidence and decide whether the parties formed a partnership or joint venture.

      F.      Trademark Infringement

      Plaintiffs bring two trademark infringement claims against Defendants Mittal and ADX. The claims are not alleged against Defendant Axeno. *See* Def. Axeno Reply, ECF 213. Claim 1 alleges violation of section 43(a) of the Lanham Act based on the trademark application Defendant Mittal signed. Am. Compl. ¶¶ 166-173. Claim 2 alleges violation of Oregon's trademark infringement laws based on the trademark application Defendant signed and unspecified "other things." *Id.* ¶¶ 174-181. Defendants move for summary judgment on both claims. Def. Eighth Mot. The Court concludes that Defendants are not entitled to summary judgment on the trademark claims.

//

//

    i.  Lanham Act Claim

Plaintiffs allege that "ADX Consulting's Infringing Application, signed by Mittal, is

likely to deceive and confuse consumers as to the origin, source, sponsorship, or affiliation of

ADX Consulting's goods and services and is likely to cause consumers to believe, contrary to

fact, that ADX Consulting's goods and services are affiliated with or sponsored by Plaintiffs or

Argil DX." Am. Compl. ¶ 167.

    a.  Standard

The Lanham Act imposes civil liability on

> Any person who, on or in connection with any goods or services, or any container
> for goods, uses in commerce any word, term, name, symbol, or device, or any
> combination thereof, or any false designation of origin, false or misleading
> description of fact, or false or misleading representation of fact, which—
>
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the
>> affiliation, connection, or association of such person with another person,
>> or as to the origin, sponsorship, or approval of his or her goods, services, or
>> commercial activities by another person[.]

15 U.S.C. § 1125(a)(1)(A).

> The term 'use in commerce' means the bona fide use of a mark in the ordinary
> course of trade, and not made merely to reserve a right in a mark. For purposes of
> this chapter, a mark shall be deemed to be in use in commerce—
>
>> . . . (2) on services when it is used or displayed in the sale or advertising of
>> services and the services are rendered in commerce, or the services are
>> rendered in more than one State or in the United States and a foreign country
>> and the person rendering the services is engaged in commerce in connection
>> with the services.

Id. § 1127.

    b.  Application

Defendants move for summary judgment on Plaintiffs' Lanham Act claim because the

filing of a mark is not "use in commerce." Def. Eighth Mot. 4 (citing 15 U.S.C. § 1127).

Plaintiffs respond that Defendants sent out invoices with the Argil DX banner on them. Pl. Resp.

32. Plaintiffs submit copies of three invoices sent from Defendant ADX in March, April, and July of 2021, all of which display the Argil DX banner. Williams Decl. Ex. J. Defendants reply that Plaintiffs' claim alleges only the filing of the mark as an act of trademark infringement. Def. Reply 2.

Defendants are correct that the Amended Complaint alleges only the filing of the trademark application as an infringement of the trademark. Am. Compl. ¶ 167. Defendants are also correct that the filing of a trademark application is not an infringing use in commerce. But Plaintiffs' evidence that Defendants used the mark on invoices would constitute evidence of infringement. The question is thus whether Plaintiffs should be permitted to proceed on their claim based on the invoices.

As explained above, an argument made in opposition to a motion for summary judgment that is outside the scope of the complaint is construed as a motion to amend the pleadings under Rule 15. *Desertrain*, 754 F.3d at 1154. The Court thus evaluates whether justice requires leave to amend, considering whether (1) the amendment would be futile, (2) Plaintiffs acted in bad faith, (3) the amendment would cause undue delay, or (4) the amendment would prejudice Defendants. Amendment would not be futile here, and the Court has no evidence that Plaintiffs acted in bad faith. Defendants do not argue otherwise, instead asserting that Plaintiffs' reliance on the invoices would prejudice them. *See* Def. Reply 4-5. Defendants argue that Plaintiffs' failure to include the invoices in their expert report "has deprived ADX and Mr. Mittal from the opportunity to provide expert evidence" opposing Plaintiffs' expert's quantification of damages. *Id.* Defendants state that Plaintiffs' expert report does not address damages for trademark infringement. *Id.* at 4. Plaintiffs assert that their expert, Ms. Couch, "reported co-conspirator revenues and profits" for the period of time during which the invoices were sent. Pl. Resp. 32.

But they point to nowhere in Ms. Couch's report that addresses damages for trademark infringement. As Defendants point out, the Couch Report only uses the word "trademark" twice, in neither context related to damages. *See* Aldred Decl. Ex. 20 at 6.

It appears that Plaintiffs are asserting that the value of the invoices constitutes the damages for trademark infringement. *See* Pl. Resp. 34. Defendants state, "To the extent those invoices are an attempt to suggest disgorgement of ADX's profits as a remedy for trademark infringement, ADX would be entitled to offer expert testimony about costs that must be deducted from these invoiced amounts to result in actual profits." Def. Reply 5 n.6 (citing 15 U.S.C. 1117(a)). Defendants are correct.

Defendants also point out that the Couch Report addresses Defendant Axeno's sales, not Defendant ADX's sales, and the trademark claims are not raised against Defendant Axeno. Def. Reply 5. This is true. However, Plaintiffs are permitted to argue that Defendants were co-conspirators and thus liable for each other's damages. *See* Pl. Resp. 34; Am. Compl. ¶¶ 39-42, 275-281 (conspiracy allegations). Further, in her report, Ms. Couch stated, "I have not received any financial discovery related to ADX Consulting." Aldred Decl. Ex. 20 at 15. The Court cannot conclude that Plaintiffs alone are at fault for the limitations of the Couch Report.

On this record, the Court concludes that it is in the interests of justice to allow Plaintiffs to proceed on their Lanham Act claim based on the invoices they have identified. The Court also concludes that there is good cause to allow further expert discovery on the damages associated with the claim. Trial in this case is set for June 24, 2024. ECF 217. The parties may engage in supplemental expert discovery on this issue until two weeks before the first wave of pretrial documents is due. Given the narrow scope of this supplemental discovery, the parties should have ample time to complete it without delaying the case, and Defendants will not be prejudiced.

Plaintiffs assert that they are entitled to statutory damages under 15 U.S.C. § 1117(d) for a violation of 15 U.S.C. § 1125(d)(1). Pl. Resp. 34. Section 1125(d)(1) imposes liability on one who "has a bad faith intent to profit from" the trademark of another and "registers, traffics in, or uses a domain name that . . . is identical or confusingly similar to that mark[.]" 15 U.S.C. § 1125(d)(1)(A). Plaintiffs point to evidence of bad faith in the form of an email from one of Defendant Axeno's executives to Defendant Mittal, and evidence that Defendants used the parties' common website to obtain business outside of the parties' collaboration. Pl. Resp. 34-35. The Court need not evaluate the viability of Plaintiffs' claim for statutory damages because Defendants' argument against the claim misses the mark. Defendants construe the claim as one for attorney fees and assert that a claim for attorney fees does not create a case or controversy. Def. Reply 5. The claim is for statutory damages, not attorney fees. The Court has insufficient argument from the parties to further address Plaintiffs' claim for statutory damages.

Finally, Defendants argue that the claim for injunctive relief is moot because no Defendants are using the name "Argil DX" in commerce. Def. Eighth Mot. 6. Plaintiffs do not respond to this argument. Defendants have abandoned the trademark application, and Plaintiffs have not identified any ongoing use of the mark in commerce. However, Defendants have not conclusively demonstrated that they have no intention of using the Argil DX brand in commerce in the future, so the Court declines to find that Plaintiffs' claim for injunctive relief is moot. *See Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135-36 (9th Cir. 1986) (reversing district court's denial of permanent injunction where the record did not conclusively establish that the defendants would cease violating the plaintiff's trademark rights).

In sum, Plaintiffs may proceed on their Lanham Act claim based on the allegedly infringing invoices. The parties may conduct further expert discovery to permit Defendants to challenge Plaintiffs' allegations on damages. The claim for injunctive relief may also proceed.

      ii.    Oregon Trademark Law Claim

          a.    Standard

Oregon common law protects interests in tradenames and trademarks. *Classic Instruments, Inc. v. VDO-Argo Instruments, Inc.*, 73 Or. App. 732, 736, 700 P.2d 677 (1985). "In an action for trademark infringement, the question is whether customers or users of goods or services are likely to be confused about the source of the goods or services." *Id.* "A determination of whether confusion between goods is likely generally involves consideration of several factors: the strength of the trademark, the similarity of the trademarks, marketing channels and methods, proximity of the goods, evidence of actual confusion and the degree of care likely to be exercised by a potential customer." *Id.* at 737. Oregon courts appear to apply the standards for Lanham Act claims to claims under Oregon common law. *See id.* at 736-37.

          b.    Application

Defendants move for summary judgment on Plaintiffs' Oregon trademark infringement claim because Plaintiffs have identified no allegedly infringing conduct in Oregon. Def. Eighth Mot. 5. Defendants assert that Oregon trademark law requires infringement in Oregon. *Id.* (citing *Deardorf v. Idaho Nat. Harvester Co.*, 90 Or. 425, 433, 177 P. 33 (Or. 1918) ("It is axiomatic that the laws of a state have no extraterritorial effect."); *State ex rel. Juvenile Dept. of Washington County v. Casteel*, 18 Or. App. 70, 75, 523 P.2d 1039 (Or. App. 1074) (same); *Ivie v. AstraZeneca Pharms., LP*, 2021 WL 5167283, at *3 (D. Or. Nov. 5, 2021), *rev'd on other grounds* 2023 WL 3563007 (9th Cir. May 19, 2023) (holding that plaintiff failed to overcome the

presumption against extraterritorial application of an Oregon statute)). Acknowledging that the

presumption against extraterritoriality is generally applied to statutes, Defendants assert that it

also applies to common law. *Id.* (citing *Leibman v. Prupes*, 2015 WL 3823954, at *7 (C.D. Cal.

June 18, 2015) (collecting cases)). *Leibman* concluded that, assuming for the sake of argument

that the presumption against extraterritoriality applied to common law claims, there was no

improper extraterritorial application under the circumstances of the case. 2015 WL 3823954, at

*7. *Leibman* applied California law on extraterritoriality. *Id.* Defendants also cite two cases in

which district courts declined to apply state common law on infringement to conduct that

occurred in China. *See Soylent Nutrition, Inc. v. Jue*, 2020 WL 8459139, at *7 (D. Nev. Oct. 13,

2020) (granting as unopposed defendant's motion to dismiss a trademark infringement claim

based on defendant's argument that Nevada law did not apply abroad); *BLK Enters., LLC v. Unix

Packaging, Inc.*, 2018 WL 5993844, at *7 & n.2 (C.D. Cal. June 14, 2018) (grating motion for

judgment on the pleadings on claim for trade dress infringement under California law because no

authority indicated whether California law applied abroad).

   Defendants' argument misses the mark. Plaintiffs' Oregon trademark claim is not

statutory, and the substantive law that applies to a common law claim is governed by a choice of

law analysis. "In a federal question action where the federal court is exercising supplemental

jurisdiction over state claims, the federal court applies the choice-of-law rules of the forum

state[.]" *Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996). The

Court thus applies Oregon "choice of law rules to determine the controlling substantive law."

*Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002). "The threshold question in a choice-of-

law problem is whether the laws of the different states actually conflict." *Spirit Partners, LP v.

Stoel Rives LLP*, 212 Or. App. 295, 301, 157 P.3d 1194, 1198 (2007). "The proponent of

applying a different state's law has the obligation to identify a material difference between Oregon law and the law of the other state." *Portfolio Recovery Assocs., LLC v. Sanders*, 292 Or. App. 463, 468, 425 P.3d 455, 459 (2018) (citing *Spirit Partners*, 212 Or. App. at 301). "Where no material difference exists between Oregon law and the law of the proposed alternative forum, Oregon courts will apply Oregon law without regard to the relative significance of the relationship between the dispute and the proposed alternative forum." *Powell v. System Transp., Inc.*, 83 F. Supp. 3d 1016, 1022 (D. Or. 2015).

In their Motion, Defendants failed to identify which substantive law should govern or explain how it differs materially from Oregon law. They have thus failed to meet the threshold requirement to show that Oregon law should not apply. At oral argument, Defendants asserted that Defendant ADX acted in Texas. If the Court were to construe this as a request to apply Texas law, the outcome is the same. A claim for trademark infringement under Texas common law follows the standards of the Lanham Act. *Hot-Hed, Inc. v. Safehouse Habitats (Scotland), Ltd.*, 333 S.W.3d 719, 730 (Tex. App. 2010). So does a claim under Oregon common law. And even if Defendants had shown a material difference in the law, Oregon law still governs.

Oregon's choice of law statute has a provision for noncontractual claims, and the rules are based on the place of domicile, the place of injury, and the place of the injurious conduct. O.R.S. 15.440. Particular rules apply "[i]f the injured person and the person whose conduct caused the injury were domiciled in different states and the laws of those states on the disputed issues would produce a different outcome[.]" O.R.S. 15.440(3). "If both the injurious conduct and the resulting injury occurred in the same state, the law of that state governs if either the injured person or the person whose conduct caused the injury was domiciled in that state." O.R.S. 15.440(3)(a). "If the injurious conduct occurred in one state and the resulting injury in

another state, the law of the state of conduct governs." O.R.S. 15.440(3)(c). But law of the state of injury governs if two conditions are met:

(A) The activities of the person whose conduct caused the injury were such as to make foreseeable the occurrence of injury in that state; and

(B) The injured person formally requests the application of that state's law by a pleading or amended pleading. The request shall be deemed to encompass all claims and issues against that defendant.

O.R.S. 15.440(3)(c)(A)-(B). Notwithstanding these rules, Oregon law governs "[a]ctions in which none of the parties raises the issue of applicability of foreign law." O.R.S. 15.430(2).

Plaintiffs Meyer and Zap are citizens of Oregon, while Defendant Mittal is a citizen of India and Defendant ADX is a Texas entity. It is undisputed that any injury occurred in Oregon. The key question is whether Defendants Mittal and ADX committed any infringing acts in Oregon. Plaintiffs assert that the trademark application includes evidence that Defendant ADX was doing business in Oregon. Pl. Resp. 33. They point to screenshots of the Argil DX website listing an address in Beaverton, Oregon, that were included with the application. *Id.* Defendants reply that this evidence does not show that Defendant Mittal used the mark in commerce in Oregon. Def. Reply 3. They assert that the webpage printouts show use of the mark in commerce by Defendant Axeno, not Defendant ADX. *Id.* They point out that the address on the website is Plaintiff Zap's address. *Id.* It is undisputed that Defendant ADX was never in a partnership with Plaintiff Zap and did not otherwise collaborate with Plaintiff Zap. Screenshots from the website Plaintiff Zap and Defendant Axeno used during their collaboration are not evidence that Defendant ADX used the mark in commerce in Oregon. The screenshots are likewise unavailing as to Defendant Mittal because the claim against Defendant Mittal is based on the same alleged conduct by Defendant ADX from the same timeframe. Plaintiffs do not point to other evidence that Defendant ADX used the mark in commerce in Oregon. Thus, under the default choice of

law rules, assuming that there is a material difference between Oregon law and the law of the state of conduct—which Defendants have not shown—Oregon law does not govern.

However, both of the requirements to apply Oregon law under O.R.S. 15.440(3)(c) are met. First, it was foreseeable when Defendants Mittal and ADX sent the allegedly infringing invoices that the injury would occur in Oregon, where Plaintiffs Zap and Meyer are domiciled and operate. Second, Plaintiffs requested the application of Oregon law by bringing their infringement claim under Oregon law. *See* Am. Compl. 33 (titling claim "Oregon Common Law Unfair Competition and Trademark Infringement"). Another court in this district concluded that pleading the claim under Oregon law sufficed as a formal request for the application of Oregon law. *HTI Holdings, Inc. v. Hartford Cas. Ins. Co.*, No. CIV. 10-6021-AA, 2011 WL 6205903, at *3 (D. Or. Dec. 8, 2011) (citing former O.R.S. 31.875(3)(c)). The Court agrees with *HTI Holdings*. Because Oregon law governs the claim, Defendants' Motion fails.

In conclusion, the Court denies Plaintiffs' Motion for Partial Summary Judgment because material disputes of fact remain on Defendants' SCA and invasion of privacy counterclaims. The Court denies Defendants' Motion as to the unclean hands affirmative defense and declines to estop Plaintiffs from arguing that a partnership existed. The Court grants Defendants' Motion as to Plaintiffs' claim for breach of the duty of loyalty with respect to the EY contracts but otherwise denies the Motion as to Plaintiffs' breach of fiduciary duty claims. The Court denies Defendants' Motion as to disgorgement of profits. The Court denies Defendants' Motion as to intentional interference with the then-existing contract between Plaintiff Zap and EY, and grants it as to an expectation of future contracts with EY. Finally, the Court denies Defendants' Motion as to Plaintiffs' trademark claims.

**CONCLUSION**

Plaintiffs' Motion for Partial Summary Judgment [183] is DENIED. Defendants' Motion

for Partial Summary Judgment [186] is GRANTED IN PART AND DENIED IN PART.

Defendants' Motion for Partial Summary Judgment [187] is DENIED. Defendants' Motion for

Partial Summary Judgment [188] is DENIED.

IT IS SO ORDERED.


DATED:_____February 1, 2024___.


_____
MARCO A. HERNÁNDEZ
United States District Judge